UNITED STATES

v.

Elbert D. POLLARD, Seaman, U.S. Coast
Guard.

Misc. Docket No. 001–62–88.

U.S. Coast Guard Court of
Military Review.

10 Aug. 1988.

**948**

Trial Counsel: LT C.J. Bennardini, USCG.

Defense Counsel: LCDR Michael Tagg, USCG.

Civilian Defense Counsel: Mr. Steven Forrester.

Appellate Defense Counsel: LCDR Robert Bruce, USCG.

Appellate Government Counsel: LCDR R.T. Buckingham, USCG.

Co–Counsel (On Appeal): LCDR S.T. Fuger, Jr., USCG.

## OPINION OF THE COURT ON APPEAL OF THE GOVERNMENT FROM TRIAL JUDGE'S RULING SUPPRESSING EVIDENCE

### PANEL ONE

BAUM, Chief Judge:

This is the Coast Guard's second Government Appeal under Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862. The first, *United States v. Solorio*, 21 M.J. 512 (C.G.C.M.R.1985), Aff'd 21 M.J. 251 (C.M.A.1986), Aff'd —— U.S. ——, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), involved the jurisdictional question of "service connection" for court-martial offenses, a concept forsaken by the U.S. Supreme Court in its ultimate action on the case. This second challenge of a judge's ruling relates to an entirely different matter, but one no less important, involving as it does, the military's mandatory random drug testing program and the use in court-martial prosecutions of evidence developed as part of that program. Here, the appeal is from the judge's decision at a court-martial to suppress such evidence obtained from one of the Coast Guard's mandatory drug tests. The military judge, after considering testimony and other evidence, found as fact that the Coast Guard had not complied with two of its procedural requirements for the collection of urine samples as set out in the service regulation governing the subject. The judge found that these procedural violations directly affected the reliability of the urine collection process, rendering the test results inadmissible. On appeal by the Government, we must decide whether the judge's actions were correct or incorrect as a matter of law.

The Government contends that the two instances of non compliance with the sample collection procedures were *de minimis* deviations from Coast Guard procedures, of no consequence to the accused, and for that reason, asserts that the military judge erred as a matter of law in suppressing the evidence. In response, the accused submits that the matter is controlled by well settled law requiring the government to abide by its own rules and regulations whenever the underlying purpose of such regulations is the protection of personal liberties or interests. The defense further asserts that the judge correctly found the regulation in question to be for the benefit of individual service members as well as the government, and, accordingly, properly applied the general rule in suppressing the evidence. The defense also argues that the judge acted within his discretion in a proper manner by excluding evidence which he found to be unreliable.

Before addressing the specific issues which have been joined, we note that the Constitutionality of the urine testing to which the accused was subjected has not been questioned. In this regard, the Court of Military Appeals ruled five years ago in *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983) that mandatory random drug testing under a Department of Defense authorized plan for uniformed military personnel violated neither the fourth nor fifth amendments of the U.S. Constitution, even when the results were used for criminal prosecution. That ruling was not appealed to the U.S. Supreme Court, there being no provision for certiorari at the time. Since then, the Uniform Code of Military Justice has been amended to provide for direct appeal

from Court of Military Appeals decisions, but the issues ruled upon in *Murray v. Haldeman* have yet to be addressed by our highest Court. Constitutional questions relating to drug testing of civilian federal employees in non-criminal contexts, however, are presently before the U.S. Supreme Court in two cases to be heard together next Term.[1]

■ Constitutional issues aside, the lawfulness of the military order to produce a urine sample for testing has also not been challenged, presumably because such orders are now covered by the Military Rule of Evidence relating to inspections and inventories. Subsequent to *Murray v. Haldeman, supra,* Military Rule of Evidence 313(b) was expanded to expressly include orders to produce body fluids, such as urine, within the rubric of military inspections and in *United States v. Johnston,* 24 M.J. 271 (C.M.A.1987), the Court of Military Appeals applied that rule approvingly to another Department of Defense authorized mandatory urinalysis test. In so doing, the Court said that, "[l]ike other lawful inspections, a urinalysis must be ordered for a legitimate purpose and be conducted in a lawful manner," and found one valid purpose to be "the special interest of the military in ferreting out illegal drugs and protecting the health and fitness of its members." *Id.* at 274. Since that purpose undoubtedly applies equally to the Coast Guard as one of the armed services [2], the sole litigated issues presented for resolution, here, are whether the inspection in this case was conducted in a lawful manner [3] and whether, as a result, the evidence

generated by that inspection was admissible before a court-martial.

The evidence developed at trial establishes that on 30 September 1987 drug urinalysis testing was ordered for approximately thirty randomly selected uniformed Coast Guard personnel at U.S. Coast Guard Base Miami Beach, Florida. Included in that group was the accused, who, according to his own testimony, provided two urine samples, as required on that date. He recalled being handed two empty containers, at the outset, by one of the two urinalysis coordinators. Following that, he went into the head and filled both cups at the urinal while the designated urinalysis observer was present, returning with the filled containers to a table where both coordinators were seated. After a four to five minute wait, while his social security number was being verified from his service record, the paper work was completed. At that time, according to the accused, he initialed documents upon being asked to compare the numbers in the ledger and on the custody form with those on the urine containers. The accused could not recall whether labels reflecting the assigned numbers were affixed to the empty containers when first handed to him or later, after he had filled the cups. The coordinator testified, however, that the labels were attached to the empty containers at the beginning of the process and recorded in the log at that time with the provider's name.

The judge found that the labels were affixed at the time testified to by the coordinator. He further found that this out-of-sequence labeling of the empty containers

1. *National Treasury Employees Union v. Von Raab,* 808 F.2d 1057 (5th Cir.1987) *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) presenting, *inter alia,* the question whether a Customs Service urine testing program required as a condition for promotion and certain job transfers violates the fourth amendment; and *Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.1988) *cert. granted* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), presenting, *inter alia,* the question whether Federal Railroad Administration regulations mandating blood and urine tests of employees after certain train accidents, fatal incidents and rule violations, contravene the fourth or fifth amendments.

2. There also appears to be an additional reason for drug testing in the Coast Guard stemming from law enforcement responsibilities, currently unique among the military services, which include preventing the entry into the United States by sea of illegal drugs.

3. With respect to the manner in which drug tests are conducted, it is judicially noted that, although the Coast Guard is an armed force within the Department of Transportation rather than Defense, its drug testing program for Coast Guard personnel, is essentially the same as that utilized by the other military branches in the Department of Defense.

was a critical violation of the required order of events. The other procedural violation found by the judge was the designated observer's failure to initial the chain of custody form. The observer could not specifically recall what transpired on 30 September 1987 with respect to the accused, but did describe his routine procedure observing test participants filling containers in the head and his follow-up procedure presenting the samples to the coordinator. The observer said that he did not sign chain of custody forms because there was no space designated on the form for his signature. That printed document on its face called for the signature of only the collection coordinator and the initials of the provider, which was accomplished in this case.[4]

The procedures for collection and testing of urine samples are set out in a regulation from Coast Guard Headquarters. That regulation, Commandant Instruction 5355.1 of 2 July 1985, (record of trial defense exhibit B) mandates a specific manner in which urine is to be collected, labeled for identification, and recorded. Paragraph 4 of that exhibit, which delineates the required sample collection process, is attached as Appendix A. The judge found that the requirements in paragraph 4.g., for attaching separately-numbered bar code stickers to the containers after being filled by the provider and for initialing of the chain of custody form at that time by the observer were violated. Moreover, he concluded that these violations, "directly affect the reliability of the collection process involving Seaman Pollard, and that the results of the urinalysis on 30 September 1987, as to Seaman Pollard are inadmissible." (ROT 223). The judge then went on to say, "The defense's motion to suppress is granted. The basis for my ruling is, solely, noncompliance with paragraph 4.g

of the Commandant Instruction. I find specifically, that all other factors raised by the defense in this motion properly go to the weight of the evidence and not to the admissibility. The last part is added because the government has a right to appeal my decision and I want to make very clear the basis of my decision and my ruling." (ROT 223).

The judge's statements present this Court with two possible bases for his suppression ruling. First, he may have believed the law required him to suppress the evidence upon finding that the government had failed to follow its own regulation with respect to sample collection procedures for drug testing. On the other hand, he may have determined that the procedural violations were such that the resulting evidence was unreliable and, therefore, inadmissible on that basis. In light of our uncertainty as to which of these two possible grounds prompted the judge's decision to exclude the evidence, we will address both.

■ If the basis for the judge's ruling was his belief that the government's failure to abide by its own rules and regulations, in the two respects found by him, required application of the exclusionary rule, we must disagree. The U.S. Supreme Court made it clear in *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), that failure to follow every internal rule will not necessarily invalidate governmental actions, nor will rule violations require suppression of resulting evidence in every instance. In *Caceres*, the Supreme Court declined to adopt a rigid exclusionary rule for evidence obtained in violation of Internal Revenue Service regulations relating to electronic eavesdropping. In reaching this result, the Court applied a

---

4. Although the observer's signature was missing from the form, the coordinator's signature and the accused's initials ostensibly authenticated the urine samples. The accused's voluntary testimony at trial identified his initials on the chain of custody form, but he also testified that he did not actually compare identifying numbers. The use of his initials to authenticate the samples was not necessary, however, if the coordinator's authenticating signature and testimony satisfied the military judge. For this reason,

any fifth amendment issue arising from the accused's being compelled to verify that the bottles contained his urine need not be addressed. Otherwise, use of his initials, which he was required by regulation to provide, in order to authenticate the urine at trial, might be considered as compelled incriminating testimony in violation of his fifth amendment rights. For a detailed discussion of this subject, *see*, Mosteller, *Simplifying Subpoena Law: Taking the Fifth Amendment Seriously*, 73 VA.L.Rev. 1 (1987).

two-step assessment of the rules that were violated. First, the Court looked to see whether the rules were mandated by the U.S. Constitution or Federal law. Upon concluding that they were not so mandated, the Court next looked to see whether the rule violations, in and of themselves, contravened some Constitutional right. Finding no Constitutional deprivations from the rule departures, the Court went on to find suppression of the evidence unnecessary.

Upon application of the approach taken in *Caceres, supra,* to the facts at hand, we reach the same result: suppression of the evidence was not required. The urine collection, labeling and authentication procedures set out by Coast Guard regulations (Appendix A) are not mandated by the U.S. Constitution or other Federal law. While we may agree with the trial judge's conclusions that the Commandant's drug testing regulation was written to benefit both the government and individual service members by establishing a procedure which satisfied fourth amendment concerns, that is not the same as saying the regulation itself was Constitutionally mandated. As in *Caceres,* the Coast Guard "was not required by the Constitution or by statute to adopt any particular procedures or rules" [5] before engaging in drug testing.

Looking next at the specific rules violated, we discern no Constitutional deprivations resulting from these procedural departures. While the out-of-sequence labeling of containers and the observer's failure to sign a chain of custody form might, under certain circumstances, affect a particular rule of evidence, we do not believe they rise to the level of violating a Constitutional right. Accordingly, the only question of Constitutional dimension presented here is whether the procedure utilized in obtaining the accused's urine for drug testing purposes, somehow, violated the fourth amendment's prohibition against unreasonable searches and seizures. As indicated

earlier, that question has already been answered by the U.S. Court of Military Appeals in *Murray v. Haldeman, supra,* with respect to the military's drug testing program in general. The two deviations from required Coast Guard procedures found by the judge do not necessitate a different result. The manner in which the accused's urine was collected, labeled and identified was not so different from that in *Murray v. Haldeman,* that it changed the process into an unreasonable search and seizure.

■ Finding no Constitutional requirement for the judge's ruling of inadmissibility, we turn to the Military Rules of Evidence for a possible basis there. Military Rule of Evidence 313(b), as previously noted, permits treatment of an order to produce body fluids, such as urine, as a military inspection, the results of which are admissible at trial. The only requirement of that Rule with respect to the manner or method of carrying out an inspection is that it "be conducted in a reasonable fashion." [6] As pointed out by Saltzburg, Schinasi and Schlueter in their *Military Rules of Evidence Manual,*[7] "timing, underlying reasons and manner of the intrusion are obviously key factors to be considered." [8] None of these elements appears to be affected by the procedural departures in this case. For that matter, we see nothing inherently unreasonable in the overall drug testing procedure followed with respect to the accused nor in the two deviations found by the judge. Most importantly, however, the judge made no finding of unreasonableness with respect to the methods utilized. Accordingly, there appears to be no issue here concerning reasonableness of the inspection.

For the foregoing reasons, we have determined that the drug testing of the accused on 30 September 1987 met the terms of a military inspection and was conducted

---

5. *Id.* 440 U.S. at 749, 99 S.Ct. at 1470.

6. Military Rule of Evidence 313(b).

7. S. Saltzburg, L. Schinasi and D. Schlueter, Military Rules of Evidence Manual (2d Ed. 1986).

8. *Id.* p. 236, Editorial Comment with respect to Rule 313(b): *The test of reasonableness.*

in a lawful manner. We have also determined that as a matter of law the evidence produced by that inspection should not have been excluded for failure of the government to follow its own regulation in the respects found by the judge. Left for consideration is the question whether the judge properly excluded the evidence because he deemed it unreliable.

■ We are unable to answer that question with assuredness because the judge did not clearly state that the evidence purporting to be appellant's urine was unreliable. If that was his determination, we would then test this ground for correctness as a matter of law, examining whether there is sufficient evidence to support such a finding and evaluating whether suppression for this reason is properly based on a rule of evidence covering the matter. In that regard, we have looked for a military rule of evidence which would cause exclusion based on unreliability and we find none couched in such terms. There is, of course, a requirement for relevance and authentication in order for evidence to be admissible and, presumably, the evidence could be so unreliable that it is neither relevant nor authentic, but that has not been stated by the judge to be the case here. Absent such a determination, it would seem that reliability of the evidence in this case bears only on weight, just as the judge specifically found with respect to all other factors raised by the defense on the motion to suppress. Until amplification of the judge's "reliability" statement is provided, this aspect of his ruling is left unresolved.

In summary, we have determined that suppressing the urinalysis test results based on the two departures from Coast Guard procedures found by the judge would be an error of law. The procedure set out in the Commandant Instruction governing urine testing is not mandated by either the Constitution or Federal law. The violations of that Instruction, as found by the judge, affected no rights under the Constitution or Federal statute, nor did the overall manner of collecting, labelling and recording the accused's urine violate any Constitutional rights. Finally, the collection method, despite the two deviations, was not found to be unreasonable and, thus the test under Military Rule of Evidence 313(b) for admissibility as an inspection appears to have been satisfied. Accordingly, if the judge's ruling was based solely on violations of the Coast Guard regulation, it is reversed and he should continue with the trial. If, on the other hand, the judge's ruling was grounded on a determination of evidence unreliability, then, upon return of this record, he should clearly state that conclusion and, in so doing, he should also indicate the factual basis for this determination and the legal ground for suppressing the evidence. Otherwise, any question of reliability will be deemed to go only to weight, not admissibility.

For the foregoing reasons, the record is returned for action in accord with this opinion, including continuation of the trial, depending on the basis for the judge's ruling suppressing the evidence.

Judges BRIDGMAN and JOSEPHSON concur.

### APPENDIX A

4. SAMPLE COLLECTION PROCEDURES.

a. Commanding officers shall designate Drug Urinalysis Sampling Coordinators in writing. Sampling Coordinators shall supervise all sample collections and make all sample ledger entries and, with the exception of the commanding officer and executive officer, shall have:

(1) sole access to the sample ledger's place of storage;

(2) sole access to the storage facility for second samples retained by the command in accordance with reference (a) [Article 20–B–2, CGPERSMAN (COMDTINST M1000.6)];

(3) sole access to sample collection and mailing materials; and

(4) sole access to chain of custody/test result forms prepared for second samples retained by the command in accordance with reference (a).

b. Commanding officers shall designate Drug Urinalysis Sampling Observers in writing. Observers shall be of the same gender as the members providing samples.

c. In collecting samples, the Sampling Coordinator shall initially verify the identity and SSN of each member selected to provide a sample against his or her military ID card, noting verification in the sample ledger.

d. The Coordinator shall inquire whether the member is currently taking any medication obtained by a prescription and if so, the identity of the medication shall be noted in the "Comments" section of the sample ledger.

e. The Coordinator shall issue two sample containers, with lids closed, to the Observer in the presence of the member providing the sample. The Observer shall escort the member to the collection site, open the containers and provide them to the member.

f. The Observer shall observe the member urinating into the two sample containers. Both containers shall be filled to the base of their necks. The member shall then secure the lids to each sample container. The Observer shall escort the member back to the Coordinator, with the two sample containers.

g. The Coordinator, on receiving the two sample containers, shall, in the presence of the member, ensure that both lids are tightly closed, then attach a tamper proof seal across the top of each container. One-half of separately-numbered bar code stickers shall then be attached vertically to each container. The corresponding half of each container's sticker shall be attached to each sample's chain of custody/test result form. The Coordinator, Observer and member shall then sign and initial, respectively, the ledger and chain of custody/test result form. The Coordinator shall ensure that the submitting command's OPFAC number is typed on both chain of custody/test result forms in the space provided.

COMDTINST 5355.1 of 2 July 1985.