198

UNITED STATES, Appellee,

v.

Paul A. ARGUELLO, Staff Sergeant,
U.S. Air Force, Appellant.

No. 60,381.
ACM 26182.

U.S. Court of Military Appeals.

Sept. 28, 1989.

For Appellant: *Captain Laurence M. Soybel* (argued); *Colonel Richard F. O'Hair* (on brief); *Colonel Leo L. Sergi.*

For Appellee: *Major Mark C. Ramsey,* USAFR (argued); *Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni, Major Terry M. Petrie* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

In February and March 1987, appellant was tried by a general court-martial with members at Peterson Air Force Base, Colorado. Contrary to his pleas, he was found guilty of wrongful use of marijuana, two specifications of wrongful distribution of marijuana, and wrongfully making a false statement under oath,[1] in violation of Articles 112a and 134, Uniform Code of Military Justice, 10 USC §§ 912a and 934, respectively. He was sentenced to a bad-conduct discharge, confinement for 2 years, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence in a short-form opinion dated May 12, 1988.

---

1. The alleged "false statement" was "[t]hat he had never smoked pot (marijuana) while a member of the United States Air Force."

This Court granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED BY NOT GRANTING APPELLANT'S MOTION TO DISMISS SPECIFICATION 1 OF CHARGE I BECAUSE OF THE GOVERNMENT'S DESTRUCTION OF EXCULPATORY EVIDENCE.

We hold that trial counsel's use of the negative test result on the discarded urine sample and its supporting documentation to show appellant ingested marijuana violated military regulations and denied him due process of law. *See United States v. Dunks*, 1 MJ 254 (CMA 1976); *cf. United States v. McGraner*, 13 MJ 408 (CMA 1982). *See generally Vanover v. Clark*, 27 MJ 345 (CMA 1988).

Appellant was charged with use of marijuana between November 1, 1985, and February 1, 1986. Airman Prestipino, an OSI informant and the Government's principal witness, testified that he personally observed appellant smoking marijuana on five occasions during this period: namely, on November 3, 9, and 14, 1985; December 14, 1985; and January 31 or February 1, 1986. Prestipino also testified on cross-examination that appellant told him that he smoked marijuana on the day before he provided a urine sample to his command on February 6, 1986. Airman Eric A. Jung, a second government witness, also testified that appellant smoked marijuana in his presence sometime in November 1985. However, his testimony indicated that Prestipino was not present on that occasion.

Defense counsel filed a motion prior to trial requesting that the military judge dismiss the wrongful-use-of-marijuana charge on the basis of the destruction of exculpatory evidence.[2] He asserted that appellant gave a urine sample on February 6, 1986; the Government tested it; and "[i]t came back negative." He argued, "It is my belief that the prosecutor is going to argue that the test that was given, the RIA [radioimmunoassay] test is just a screening test and it has no scientific value to show that he wasn't using marijuana within seventy-two hours or five days hence. We cannot rebut that."

Defense counsel later stated:

CDC: I guess the import of the motion, Your Honor, is the fact that it's my belief that the Government will contend that this was an RIA test, which is a screening device test. And that this test has some limitations, and therefore will propound an argument to the jury that notwithstanding the fact that during the time charged my client came up negative on the Air Force's own test, that the jurors shouldn't give any weight to that. That's one side of it. The other side—

MJ: Even if they hadn't destroyed the urine sample and you had it right there on your desk in front of you, he would still have that argument if he wishes to make it.

CDC: *No, Your Honor, he wouldn't have that argument because my expert would perform two other tests on the urine, and would be able to come to definite, scientific conclusions regarding those two other tests.* The same tests, as a matter of fact, that the Government performs if you come over the RIA threshold.

MJ: Then your expert would do a mass spec [*see* n. 4, *infra*]?

CDC: He does a mass spec and he does one other test, too, Your Honor.

(Emphasis added.) The following occurred next:

MJ: So you wouldn't be making the argument that defense fears?

TC: *I certainly intend to if they offer that.* If they offer that, I intend to have evidence, not argue, evidence that is a possibility. *But that in any case, a negative sample reported by the Brooks Air Force Base laboratory under first, whether an RIA came back negative, or*

---

2. He also moved that the false-statement offense noted above be dismissed on this basis. Appellate counsel did not include this specification in his petition for review before this Court or in pleadings before the Court of Military Review. We will apply our holding to this specification on the basis of plain error. *See United States v. Eckhoff*, 27 MJ 142, 144 (CMA 1988).

*second, whether that included a GC/MS [see n. 4, infra] that came back negative, is not necessarily a true negative sample.* It seems to me that the crux of the defense issue here is—we may well argue that, *and we intend to right now sir, that a negative is quote not necessarily a negative.* And what they would like to have is the urine sample here today to be able to submit to further testing to see if there is any trace of THC [tetrahydrocannabinol] in it.

There are cases, and this is something I would have to have a recess for, there are cases on point, Your Honor, well, not exactly on point factually, there are cases where the Government has destroyed a positive sample, and it was nevertheless found to not prejudice the Accused. In this case, a negative sample was destroyed in accordance with all DOD and Air Force regulations pertaining to the storage of samples at the drug testing laboratory. The fact that we may be able to demonstrate to the court, should the issue be raised about how the urinalysis system is done and the true meaning of a result, negative or positive, is a weight question as opposed to admissibility.

Ultimately, Your Honor, should you be of a mind to give this more thought yourself, we would ask for a recess necessary to retrieve the cases dealing with discovery of urinalysis samples and production of urinalysis samples maintained by the Brooks laboratory.

MJ: Well, I think you're going to need your recess, because I hear you arguing in another case that somebody should be convicted on the same kind of evidence that you now want to tell this court doesn't necessarily mean he's used it. So it's hard for me to see how the Government can have it both ways.

TC: Your Honor, I think you are well aware of the facts of the system and the legal cut-offs imposed by the system. Alright, you are aware of the fact, sir, that a positive testified to by the experts shows the presence of THC metabolites. But because of the legal cut-off limits utilized for various reasons, a fact that one hundred nanograms in an RIA screening test, a man may test at ninety-nine nanograms and be called a negative. *In reality, that is not necessarily a true negative. We are not proposing to raise the issue unless the defense does.* If the defense tries to imply, as we expect they will, that six days after smoking of marijuana is to have occurred that this *negative test shows that he could not have been smoking on that date, then we intend to rebut that as we are entitled to do.* We are not intending to use that urinalysis to prove anything at this point. If they care to open that door and raise that issue, then we are entitled to fully explain it.

MJ: I will give you an opportunity to provide me some authority. I'm having a little difficulty with the reasoning that you should be allowed to put somebody in prison in a case next week using that same kind of evidence. But here in this court today, argue that this Accused shouldn't have the advantage of it when it appears to be exculpatory in nature. The Government uses it all the time for its own purposes. Can we have the— well before we go to that, is there anything further, any more motions?

(Emphasis added.) The military judge, after hearing additional witnesses, denied the defense motion, stating:

MJ: The Accused has complained that he was tested, his urine was tested, a negative finding was had, which is in favor of the Accused, but that the Government destroyed the urine sample denying him the opportunity now of using a retest of his own to further enhance the theory of his case. I find that the screening test was performed on the Accused's urine within days after a sample was provided which resulted in a negative finding. *That is that any THC in the urine was less than one hundred nanograms per milliliter, therefore not usable by the Government as a positive in any action against him.* I find that thereafter, in accordance with established procedures and in good faith, the Accused's sample was destroyed by lab personnel. I find

this procedure to be reasonable. The lab could not be expected to store and account for thirty thousand samples per month, or any such large quantity. *And the donors of the destroyed samples are the beneficiaries of the negative findings.* I find that the OSI Agent working the case had been told that the Accused smoked marijuana the night before the test. Nevertheless he took no action to preserve the specimen. I find that he had no duty to do so since the test result would be available and was favorable to the Accused. I find that the negative findings are available to this court. *I find that the evidence has an obvious exculpatory value, being a negative finding, and can be argued effectively to the triers of fact.* I find that no other exculpatory value was apparent to lab personnel before the sample was destroyed. I find that the Accused's rights were adequately protected in this case because the test results are available although the sample is not, and the Accused can attack or defend the reliability of the test as he deems appropriate. I find the detailed test results adequate to permit any expert in the premises to testify in a manner supportive of the defense theory of the case. And I find the test results of comparable value to the sample itself. Accordingly, the motion is denied.

(Emphasis added.)

Defense counsel in his opening argument to the members asserted that "my client took a urinalysis test in February and came up negative." The defense subsequently presented Dr. David Bowerman, who testified that, if an individual smoked marijuana on February 5th, he would expect the result of the urinalysis test on February 6th to be positive.[3] On cross-examination, Dr. Bowerman stated that appellant's RIA reading of 32,650 indicated that the sample could contain zero to ninety-nine nanograms of THC. The defense then presented the RIA laboratory report to the court members.

In rebuttal, the Government presented its expert, Dr. Peter Falk. Dr. Falk testified that an RIA reading of 32,650 radioactive counts per minute conclusively demonstrated that THC metabolites were present in appellant's urine. Defense counsel renewed his motion to dismiss in light of this testimony. In his closing argument, trial counsel stated that both experts "support[ed] the prosecution['s] theory on use of marijuana. There was THC in that urine."

---

The broad question presented in this case is whether the military judge erred by failing to dismiss the use-of-marijuana charge against appellant because the government laboratory destroyed a relevant urine sample. It was established at trial that appellant's urine was tested by the Government under the RIA method,[4] the result was negative, and the sample was discarded in

**3.** He also testified that, if a person was "a heavy user" of marijuana, a use on February 1st alone would produce a positive result on February 6th, but "a light user" would have a negative result on February 6.

**4.** Air Force Regulation 30–2 (18 Apr. 1986) states:

> Section B—Drug Urinalysis Testing Procedures 5–3. *Biochemical Test Methodology.* Urinalysis testing is a scientifically precise and accurate method to detect the presence of drugs in urine. Minute quantities of drug residue or their metabolites can be detected by the various procedures used:
> a. *Radioimmunoassay (RIA).* Specimens are first screened for drugs by RIA. The test has the sensitivity to detect very small quantities

(measured in nanograms) of drug metabolites per milliliter of urine. *However, the Air Force uses conservative values well above the RIA sensitivity level. This higher value prevents a positive reading which might result from some extraneous cause (such as, passive inhalation).* The RIA test procedure includes adding radioactive antigen and antibody reagents to urine. The radioactive antigen competes with the target drug, if present, for the antibody. The resulting mixture is centrifuged to separate the antigen and antibody complexes, and is placed in a gamma radiation counter to measure its bound and unbound radioactivity. The level of radioactivity is proportional to the amount of specific drug in the urine. The positive test result is called a "presumptive positive." Each specimen that gives a pre-

accordance with governmental regulations prior to the performance of other tests which might confirm this negative finding. *See* Enclosure 3, para. I.1, DOD Directive 1010.1 (December 21, 1984). In view of the absence of any evidence of bad faith on the part of laboratory personnel and the availability of a laboratory report on that sample showing the negative result, we would normally find no Due Process error in the judge's ruling. *See Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Garries,* 22 MJ 288, 292–93 (CMA), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986).

The defense at trial, however, took issue with the contention that in this case the available laboratory report was comparable evidence to that which would be adduced from additional tests on the discarded urine sample. Defense counsel noted that the laboratory report was based on a RIA test conducted on the sample. However, he also asserted that trial counsel intended to attack this test as an unreliable method to show no marijuana use. Accordingly, he concluded that the Government's discarding of the urine denied him the opportunity to perform additional and more reliable tests (*e.g.,* GLC and GC/MS) which would conclusively support the initial negative finding. *See United States v. Harper,* 22 MJ 157, 160 (CMA 1986). *See generally Admissibility of Biochemical Urinalysis Testing Results for the Purpose of Detecting Marijuana Use,* 20 Wake Forest L.Rev. 391 (1984). In other words, the items of exculpatory evidence denied to the defense were the more conclusive negative laboratory results necessitated by trial counsel's initial attack on the reliability of the RIA testing method.

Of course, defense counsel was not completely disarmed in responding to this attack by trial counsel on the weight of his evidence. He could point out that, regardless of the availability of more specific tests, the Department of Defense and the Department of the Air Force decided to declare samples negative on this basis. Moreover, he could call expert witnesses to explain the general reliability of the RIA method and the probability of negative results from other tests. Finally, he could call witnesses to explain that the sample was destroyed by the Government without providing him any opportunity to further test this sample under the more specific methods. Nevertheless, he was denied the opportunity to secure the probative evidence of the highest value (*i.e.,* the results of different tests) which could directly respond to trial counsel's initial lack-of-weight attack.

In *California v. Trombetta, supra,* the government test on the breath sample was inculpatory, and the defense sought the sample to develop a scientific basis which might impeach this initial unfavorable finding. The Supreme Court expressly noted the low probability that additional tests on the inculpatory breath sample would provide favorable results to the defense. In *Arizona v. Youngblood, supra,* the government test on semen samples was inconclusive, and the defense belatedly sought the sample to develop a scientific basis which might exculpate the accused. There, the Supreme Court noted that the prosecution had not used its inconclusive test results in its case-in-chief as in *Trom-*

sumptive positive result by RIA is submitted for confirmation to a second test by a different analytical method.

b. *Gas Chromatograph–Mass Spectrometry (GC/MS).* To substantiate the presumptive positive of the RIA screen, all presumptive positives will be confirmed by GC/MS. This is the most sensitive and specific method of drug detection available. It adds the highly specific and precise technology of mass spectrometry, which measures the basic ion structure of compounds. GC/MS is an assay procedure which analyzes the unique ion fragmentation ("fingerprint") of drugs. Fragmentation of the drug molecule is accomplished by either chemical ionization or electron impact ionization. This procedure is widely recognized as the "state-of-the-art" in drug detection. Its selectivity and accuracy are so precise that it can measure minute quantities of drugs in urine.

*betta* and that any exculpatory value to the samples was not apparent to the police. In view of the acknowledged negative result of the RIA test performed in this case and trial counsel's rebuttal attack on the weight to be afforded this evidence, appellant's situation cannot be easily equated with those presented in *Trombetta* and *Youngblood*. *Cf. United States v. Augurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[5]

In any event, we need not decide this case on the basis that appellant's constitutional right to due process was violated solely by destruction of his urine sample. The Supreme Court and this Court have also recognized that the Government is bound by its own regulations, especially when the regulation is one which confers a right or which benefits an individual. *Cf. United States v. Caceres*, 440 U.S. 741, 753, 99 S.Ct. 1465, 1472, 59 L.Ed.2d 733 (1979), and *United States v. McGraner*, *supra*. Here, trial counsel's presentation of scientific evidence and his additional rebuttal argument that this negative test result was really positive violated such regulations. *Cf. United States v. Pollard*, 27 MJ 376 (CMA 1989).

Department of Defense Directive 1010.1 (December 28, 1984) concerns the Department's Drug Abuse Testing Program and "provides guidelines for the use and limitation of urinalysis results." Para. A. It further states that one of the purposes of this program is to "[p]ermit commanders to assess the security, military fitness, and good order and discipline of their commands, and to take appropriate action based upon such an assessment." Para. C 2. Finally, the directive says this about use of these results at a court-martial.

Although the DOD drug testing program is designed for specific administrative purposes, *the use of urinalysis results in disciplinary or administrative proceedings is permitted, except as oth-*erwise *limited in the Military Rules of Evidence, this Directive, or rules issued by the Department of Defense or the Military Departments.*

Para. E 1 b (emphasis added). Clearly, the intent of the Deputy Secretary of Defense in issuing the Directive was to establish uniform restrictions for local commands in their use of urinalysis results at courts-martial.

Enclosure 3 to this Directive establishes a general standard for testing. Section A states:

2. Drug testing laboratories may not report a specimen as positive unless it has been determined to be positive under two different methodologies approved by the ASD(HA).

Further, other sections of this Enclosure state:

E. *INITIAL TEST*

1. The initial test of each urine sample shall use a methodology different from the confirmation test. The initial test shall use a radioimmunoassay (RIA) process unless a different process has been approved by the ASD(HA) for the specific laboratory concerned upon recommendation of the Biochemical Testing Advisory Committee.

2. *The level at which a sample is determined to be positive based on the initial test shall be established by the ASD(HA).*

F. *CONFIRMATION TEST*

1. If the result of an initial test is positive, the specimen shall be tested by gas chromatography/mass spectrometry (GC/MS). A different confirmatory test (which must also be different from the initial test) may be used if approved by the ASD(HA) for the specific laboratory concerned upon recommendation of the Biochemical Testing Advisory Committee.

---

**5.** We do not suggest that the thousands of negative urinalysis samples need be preserved. However, assuming the directive and regulations permit prosecution in this situation, proce-dures should be developed to preserve for further testing those samples where prosecution is actually contemplated.

2. *The level at which a sample is determined to be positive based on the confirmatory test shall be established by the ASD(HA).*

G. *QUALITY CONTROL*

Each drug testing laboratory shall maintain an internal quality control program consisting of standards and controls of at least 10 percent of the total number of urine specimens analyzed.

H. *REPORTING*

1. *Any specimen that fails to meet required levels for determination as positive for either initial or confirmatory tests shall be reported as negative.*

2. Normally, results should be reported by message to the originating unit within 10 working days after the laboratory receives the specimen. A copy of the message will be submitted to the AFIP.

3. The report to the originating unit shall specify which specimens were positive and which were negative. *No further information concerning negative specimens shall be submitted to the originating unit, except when:*

\* \* \* \* \* \*

c. *As authorized by the Secretary concerned for purposes approved by the ASD(HA).*

4. The drug testing laboratory shall note test results on reporting forms required by the Military Department concerned ...

(Emphasis added.) The applicable levels establishing the concentration of marijuana or its metabolites at or above which test results were evaluated as positive were 100 nanograms per milliliter under the initial test and 20 ng/ml for the confirming test (reduced to 15ng/ml in October 1986).[6]

It is beyond cavil that the purpose of these high standards is to protect the servicemember from adverse action based on unreliable scientific testing. The Air Force has most clearly recognized this important

point in paragraph 5–3a, AFR 30–2 (April 18, 1986) which states:

a. *Radioimmunoassay (RIA).* Specimens are first screened for drugs by RIA. The test has the sensitivity to detect very small quantities (measured in nanograms) of drug metabolites per milliliter of urine. *However, the Air Force uses conservative values well above the RIA sensitivity level. This higher value prevents a positive reading which might result from some extraneous cause (such as, passive inhalation ).* ...

Paragraph 5–3e of the same regulation states:

e. *False Positive and Negatives. The system is designed to prevent misidentifying nonusers.* Incorrectly identifying a negative ("clean") specimen as positive would be a "false positive." *The RIA screening level is sufficiently conservative to eliminate extraneous reasons for a positive.* Confirmation by an additional and different test method ensures positive results are correct. Multiple and redundant quality control checks on both the technical and administrative procedures ensure accuracy. Chain of custody ensures the specimen belongs to that individual. *The overall system is weighted in favor of the individual and false positives are virtually nonexistent. A "false negative" is a specimen which may have low levels of drugs present, but, because policy concerning levels of drug presence establishes a higher decision-level, the sample is called "negative" and is not reported to the base as positive.*

(Emphasis added.) The integrity of the program is grounded on these standards.

█ Trial counsel deliberately eschewed the standards established by the Department of Defense in its directive and by the Air Force in its regulations. Instead, he called his own expert who evidenced scientifically a lower positive standard for this test and hence for the determination of

6. ASD(HA) Memorandum, Subject: Transportation of Specimens and Drug Urinalysis Testing and Retesting Levels (23 April 1985). *See also* ASD(HA) Memorandum, Subject: Drug Urinalysis Testing Levels (12 August 1986).

marijuana use. The members repeatedly questioned that witness, Doctor Falk, on this point. Trial counsel then urged the members to convict appellant on the basis of the testing data in this case. His rebuttal case induced great confusion at this court-martial within the meaning of Mil.R. Evid. 403, Manual for Courts–Martial, United States, 1984 (a negative is a positive);[7] it was barred by a DOD directive and service regulations designed to protect an accused (*see* Mil.R.Evid. 402); and, accordingly, his closing argument[8] constituted an egregious denial of due process to appellant. *See Darden v. Wainwright,* 477 U.S. 168, 182–83, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986).

We do not suggest that Doctor Falk's testimony was not *logically* relevant as a matter in rebuttal. *See generally* 6 Wigmore, *Evidence* § 1873 (Chadbourn rev. 1976). This is a Mil.R.Evid. 401 question. However, we do find that this evidence was not *legally* relevant to show use in view of the DOD directive and service regulations. This is a Mil.R.Evid. 402 question. Moreover, assuming this evidence might be legally relevant as a matter in rebuttal, additional Mil.R.Evid. 403 questions were raised. No instructions were given by the judge limiting its evidentiary consideration to rebutting the defense contention that the negative test result showed no marijuana use by appellant. Instead, trial counsel used the evidence to affirmatively show appellant used marijuana. *See United States v. Murphy,* 23 MJ 310 (CMA 1987); *United States v. Ford,* 23 MJ 331 (CMA 1987); *United States v. Harper,* 22 MJ 157 (CMA 1986).

**7.** Air Force Regulation 160–23, section 2d (31 July 1986) defines Laboratory Positive Urine as "[a]ny specimen reported on AF Form 1890, Urinalysis Custody and Record Report, by the laboratory as containing one or more drugs."

**8.** TC: Yes Your Honor, thank you. I actually had a much longer rebuttal argument than I think I'm probably going to give. And the Defense Counsel made several points that, but without addressing each and every one of those points, let me go back to something the defense said at the very beginning of this trial. He asked you if you found it surprising that

█ More particularly, we do not suggest that this directive and service regulations preclude all rebuttal by the prosecution of a defense case of non-use based on a negative urinalysis produced by the Government. Indeed, DOD Directive 1010.1 (December 28, 1984), as amended in Change 1 dated December 12, 1986, suggests the contrary. It states in Enclosure 3:

H. *REPORTING*

1. Any specimen that fails to meet required levels for determination as positive for either initial or confirmatory tests shall be reported as negative.

2. Normally, results should be reported by message to the originating unit within 10 working days after the laboratory receives the specimen. A copy of the message will be submitted to the AFIP.

3. The report to the originating unit shall specify which specimens were positive and which were negative. *No further information concerning negative specimens shall be submitted to the originating unit, except when:*

a. A request for further information concerning the results of a negative test is made by a service member or the defense counsel for use in defending against an accusation of drug use; or

b. *A service member accused of drug use in a disciplinary or administrative proceeding offers a negative urinalysis report to establish non-use, and the Government's representative requests further information concerning the negative report for rebuttal purposes;* or

the defense doesn't have to do a thing in this case if they don't want to if the Government doesn't prove its case. He's absolutely right, they don't. *But they have. What have they given you?* They've given you Airman Murro; *they've given you Doctor Bowerman;* they've given you military character witnesses, and they've given you the Accused. *Doctor Bowerman, just like Doctor Falk, supports the prosecution theory on use of marijuana. There was THC in that urine.*
(Emphasis added.)

c. As authorized by the Secretary concerned for purposes approved by the ASD(HA).

(Emphasis added.)

These provisions, however, do not expressly state or reasonably imply that trial counsel is free to jettison the testing standard previously established in the directive or exploit the destruction of negative samples required by other sections of this same directive. Other forms of rebuttal, such as raising the possibility of dilution of the sample or exposing an inadequate chain-of-custody or establishing a failure to follow proper testing procedures,[9] could be revealed in the information concerning negative results which is preserved for the Government under this section of the directive.[10] The "carte blanche" rebuttal envisioned by trial counsel was chimerical at best.

In conclusion, the Supreme Court in *California v. Trombetta,* 467 U.S. at 485, 104 S.Ct. at 2532, has clearly stated, "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." However, what is fundamentally fair can be determined only in the factual context of particular cases. *Id.; see also Arizona v. Youngblood, supra.* Here, the Government established a regulatory standard for determining when urinalysis reliably and fairly showed the use of marijuana by a servicemember. *See* Mil.R. Evid. 402.

However, trial counsel used scientific evidence to convince a court-martial to employ a lower standard to find marijuana use. Such a unilateral abrogation of government regulations was not only unauthorized but unjustified, as well. After all, the government standard did not become less reliable or necessary simply because appellant chose to rely on it to prove his innocence. Moreover, appellant's predicament was further exacerbated by the fact that the Government's establishment of the higher standard had permitted it to destroy his urine sample before more scientifically accurate tests could be performed on it.[11] Such a process viewed in its entirety was fundamentally unfair.

The decision of the United States Air Force Court of Military Review is reversed as to specification 1 of Charge I; Charge II and its specification; and the sentence. The findings of guilty thereon are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court, which may set aside the sentence and order a rehearing on the affected specifications and Charge II, or it may dismiss the affected specifications and reassess the sentence based on the remaining findings of guilty.

Chief Judge EVERETT concurs.

---

9. Discovery of such a failure to follow proper procedure might even permit a reinterpretation of the test results from a negative report to a positive one. *See United States v. Joyner,* 29 MJ 209 (CMA 1989).

10. Paragraph H 4 states:
The drug testing laboratory shall note test results on reporting forms required by the Military Department concerned. The following documents, or certified copies thereof, shall remain on file at the drug testing laboratory for at least 2 years after the laboratory reports results: completed laboratory report forms; chain of custody documents, including intralaboratory chain of custody documents; and records of initial tests, confirmatory tests, and retests for positive specimens. If a contract with a civilian laboratory is terminated for any reason, all records shall be forwarded to the appropriate Military Department and retained in accordance with the provisions of this paragraph.
a. Under procedures established by the Military Department concerned,such records (or certified copies thereof) shall be sent promptly upon request to the originating command or other appropriate authority.
b. At the end of the 2–year period, such records may be disposed of under rules of the Military Department concerned unless the originating command or other appropriate authority has requested that the records be retained.

11. As noted earlier, Doctor Bowerman testified that additional tests on the urine sample would establish whether it contained zero to ninety-nine nanograms of marijuana. Doctor Falk as noted above testified that the RIA negative result and supporting documentation conclusively showed that sample was positive.

COX, Judge (concurring in the result):

Oh! what a tangled web we weave.

When first we practice to deceive![1]

Appellant sought to dismiss a charge of wrongful use of marijuana, and by implication, the related charge of false swearing because the Government had destroyed exculpatory evidence, to wit: the sample of appellant's urine which had been rejected for confirmatory testing since it had not passed the radioimmunoassay (RIA) preliminary screening test. After the legal skirmish related in the majority opinion, the military judge denied the motion to dismiss the charges, but allowed appellant to make whatever evidentiary use of the test he deemed advisable.

Of course, appellant was trying to convince the triers of fact that the "negative" result supported his defense, that is: It proved he had not used the drug. The Government, expectedly, did not agree that the only logical inference from this test result was exculpatory and set out with its witnesses to prove that indeed the test revealed the presence of the tetrahydrocannabinol (THC) metabolites, albeit insufficient to support prosecution, but supporting the Government's case that appellant had in fact used marijuana.

The majority finds the Government's affirmative use of the screening test results to be in violation of service regulations and thus appellant was "denied ... due process of law." 29 MJ 198, 199 [2]

While I concur in the majority's result, I disagree with their rationale. There is no need to resolve this case based upon deprivation of a constitutional right. I would simply hold that the preliminary test was not admissible, for two reasons:

(1) A "negative" result such as in this case is irrelevant to guilt or innocence, Mil.R.Evid. 401 and 402, Manual for Courts–Martial, United States, 1984; and

(2) The RIA screening test is not the type of test "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Mil.R.Evid. 703.

Neither this Court nor the Department of Defense has come completely to grips with the proper use of "negative" test results. See United States v. Joyner, 29 MJ 209 (CMA 1989); United States v. Van Horn, 26 MJ 434 (CMA 1988). In fact, trial counsel implicitly argued in this case that negative does not necessarily mean negative.

There are really three results to any of the several tests available. One result is truly negative—it occurs when no THC metabolites are discovered in the urine sample.[3] The second is truly positive—it is "reasonably relied upon" by the experts as a basis for an opinion that an accused wrongfully used marijuana. See United States v. Murphy, 23 MJ 310 (CMA 1987); United States v. Harper, 22 MJ 157 (CMA 1986). The third is the intermediate result—it is the result in between true negative and true positive. In this area, either because of policy made at the highest executive levels or because of its perceived unreliability as a basis for expert opinion,

1. *The Macmillan Book of Proverbs, Maxims and Famous Phrases* 534 (B.Stevenson, 5th printing, 1965), quoting Walter Scott, *Marmion,* Canto vi, line 532 (1808).

2. As far as violations of appellant's right to fundamental due process, I am much more concerned that the Government, the Air Force in particular, prosecutes members for drug abuse based solely upon the testimony of other drug abusers, many of whom have very suspect motives for their testimony. Apparently more than one federal circuit has affirmed prosecutions for conspiracy and distribution without the *corpus delecti* of the illegal drug, because it has been consumed. They have also upheld convictions without any scientific evidence identifying the nature of the illegal drug itself. *Cf. United States v. Shrock,* 855 F.2d 327, 332–36 (6th Cir. 1988); *United States v. Osgood,* 794 F.2d 1087 (5th Cir.), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). I disagree, however, and continue to invite the defense bar to contest this practice based upon insufficiency of the evidence. *Cf. Cook v. United States,* 362 F.2d 548 (9th Cir.1966); *Slettvet v. State,* 258 Ind. 312, 280 N.E.2d 806 (1972).

3. Interestingly enough, this result does not mean that the subject tested has never used marijuana; it simply means that no THC metabolite was identified during the test.

no inference of guilt—or conversely, innocence—is available. It is this third category with which this Court is now concerned.

The RIA screening is used only to determine if further testing is mandated. The results required for further testing have been administratively determined by the Department of Defense, obviously in conjunction with scientists and experts in the area of urinalysis testing. A negative result which falls below the administratively determined cut-off level of 100 nanograms is in no way dispositive of use or nonuse of marijuana. Indeed, an individual who knowingly ingests marijuana but whose urinalysis result is 99 nanograms is granted a windfall. I would simply hold that the military judge erred in permitting the test results to be placed in evidence because they were irrelevant.

By the same token, the results of the RIA screening should not have been admitted because RIA screening is not a scientific test "reasonably relied upon by experts in the particular field in forming opinions or inferences." Mil.R.Evid 703. That test is relied upon generally for the purpose of establishing the need for additional tests, such as the gas chromatography/mass spectrometry analysis.[4] It is not relied upon by experts to determine use or nonuse of drugs.

Under the circumstances of this case, the Government's failure to retain the urine sample of a subject whose results are reported negative does not violate an accused's right to exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

---

**4.** *See* P. Giannelli, and E. Imwinkelried, *Scien-* *tific Evidence* § 23–2 at 955–58 (1986).