**UNITED STATES**

v.

**Timothy A. MONFORD, Subsistence Specialist Third Class, U.S. Coast Guard.**

**CGCMS 23945.
Docket No. 935.**

U.S. Coast Guard Court of Military Review.

9 May 1990.

Military Judge: CDR Richard B. Cole, USCG.

Trial Counsel: LCDR David G. Dickman, USCG.

Detailed Defense Counsel: LT Kevin J. Collins, USCGR.

Appellate Government Counsel: LCDR Michael J. Devine, USCG.

Appellate Defense Counsel: LCDR James Collin, USCG.

Before Panel One BAUM, BRIDGMAN and SHKOR, Appellate Military Judges.

BAUM, Chief Judge:

Appellant was tried by Special Court–Martial, judge alone. Pursuant to negotiated pleas of guilty, he was convicted of two specifications of unauthorized absence, for 4 days, and one hour and 40

minutes, respectively; one specification of dereliction of duty through neglect; one specification of cocaine use and one specification of marijuana use, in violation respectively of Articles 86, 92, and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 912a. The Court sentenced appellant to a bad conduct discharge, confinement for three months, forfeiture of $200.00 per month for three months and reduction to pay grade E–1. The convening authority reduced the period of forfeitures to two months in accordance with the pretrial agreement, but otherwise approved the remaining sentence. Approval of the three months confinement was error, since the plea bargain called for reduction of the confinement to no more than two months. Pleadings filed by counsel in response to our order have revealed that, despite approval of three months confinement by the convening authority, appellant was released from incarceration after serving less than two months. Accordingly, the convening authority's error in approving three months confinement is deemed to be harmless. In our action on the sentence, we will, nevertheless, affirm no more confinement than is permitted by the pretrial agreement. The remainder of the approved sentence conforms to that agreement's terms.

Appellant has assigned one error before this Court, that the Government violated his due process interests by ignoring its regulation as to urinalysis collection procedures and that this violation requires suppression of his urinalysis sample with its resultant positive test. This matter was fully litigated at trial upon appellant's moving to suppress the evidence. After the judge had denied the motion and found the urinalysis sample to be admissible, appellant entered a conditional plea of guilty to the offenses in violation of Article 112a and, thereby, preserved his right to raise this assigned error on appeal. Rule for Courts–Martial (RCM) 910(a)(2). The fact that he pled guilty, however, does affect the posture of this issue. Since there was no trial of the drug offenses on the merits, we are not concerned at all with the weight of the evidence in determining whether or not to affirm appellant's guilt. We are confronted only with the question of whether the judge erred in deciding that the urinalysis results were admissible pursuant to the Military Rules of Evidence (MRE). The weight to be given that evidence would be a matter to be considered by the trier of fact and this Court in determining guilt beyond a reasonable doubt only if the trial had proceeded on the merits. At the motion stage, in refusing to suppress the urinalysis test results, the judge had to be satisfied only by a preponderance of the evidence bearing on the test's admissibility. RCM 801(e)(4).

The facts giving rise to the assigned error are that the accused was ordered to report to the Coast Guard Air Station, Miami, medical clinic to undergo a medical examination for the purpose of determining his fitness for duty. As part of that examination, the medical doctor ordered blood and urine samples for testing. At trial and before this Court, by brief and oral argument, appellant has contended that the Government failed to comply with a regulation which he says governs all urinalysis testing in the Coast Guard. That regulation, Commandant Instruction 5355.1A, of 24 February 1988 is a later edition of the instruction dealt with by this Court in *U.S. v. Pollard*, 26 M.J. 947 (CGCMR 1988).

In *Pollard, supra,* an appeal by the Government from a judge's ruling suppressing evidence from one of the Coast Guard's mandatory random drug urinalysis tests, we found that Commandant Instruction 5355.1 of 2 July 1985 mandated a specific procedure for collection and testing of those urine samples. The trial judge found that the government had failed to follow its instruction in two respects. Based on these deviations, he suppressed the evidence. We held that suppression of the test results simply because there were deviations from the mandated procedures was not required, and concluded that MRE 313(b)'s requirement that the inspection be carried out in a reasonable manner had been met. We left unresolved, due to the state of the record, whether the military judge properly excluded the evidence sim-

ply because he deemed it unreliable. Subsequently, the U.S. Court of Military Appeals affirmed, holding that:

> [D]eviating from a regulation or instruction which sets out procedures for collecting, transmitting, or testing urine samples does not render a sample inadmissible as a matter of law; however, such deviation may be considered along with all other factors in determining if the evidence lacks sufficient reliability to be considered by the finders of fact.

*U.S. v. Pollard*, 27 M.J. 376, 377 (CMA 1989).

In a footnote, the court noted the narrow basis of the appeal and, stated "Accordingly, we need not address any other matters which might logically affect admissibility in any particular case." *U.S. v. Pollard, supra*, n. 3.

The defense argues here that Commandant Instruction 5355.1A applies to any urinalysis conducted by or on behalf of the Coast Guard and that rather than a mere deviation from the Commandant's Instruction, as occurred in *U.S. v. Pollard, supra*, there was "a wholesale abandonment by the Government of the appropriate regulation and a conscious decision not to employ Commandant Instruction 5355.1A." Brief for Defense at 8. For this reason, the defense says his due process interests were violated, requiring suppression of his urinalysis test results.

■ We believe this question was settled once and for all in *Pollard, supra*. Failure to follow procedures for collecting, transmitting, and testing urine samples does not require suppression of the test results for that reason alone. Departures from procedural directives must be considered to determine whether they affect the reliability of the evidence or impair a right or individual benefit conferred by the regulation. *Cf. U.S. v. Arguello*, 29 M.J. 198 (CMA 1989), *U.S. v. Whipple*, 28 M.J. 314 (CMA 1989), *U.S. v. Ouellette*, 16 M.J. 911 (NMCMR 1983).

The judge in this case appears to have followed the rule from *Pollard, supra*, but, first, he found that adherence to the Commandant's Instruction was not even re-

quired in this case since the accused's urinalysis was part of a fit for duty physical. The judge found that the urine test results were admissible under MRE 312(f), which permits admission of evidence obtained from an examination for a valid medical purpose. In so doing, he found that, despite significant differences between the procedures followed here and those set out by the Commandant, the qualifications of the witnesses and the procedures used by the testing laboratory were, "sufficiently reliable to admit the evidence for consideration by the trier of fact." Record of Trial at 136.

■ Parenthetically, the defense at trial had submitted a motion asserting that the fit for duty inspection was a subterfuge for a search to obtain evidence, but later withdrew that motion as not having factual support. Before granting withdrawal, the judge wisely ensured that the accused fully understood that the issue was, thereby, waived. Accordingly, this Court is not confronted with the question whether the urinalysis testing was, in fact, a legitimate part of a valid medical examination. For our purposes, that matter was resolved at the trial level by the actions of the accused and counsel in withdrawing their motion. We need only determine whether the judge was correct in his ruling that the test results obtained here were sufficiently reliable for admission in evidence under MRE 312(f). In so doing, we will also evaluate the judge's finding that Commandant Instruction 5355.1A does not apply to urinalysis testing conducted as part of a medical examination.

We will start with the judge's determination concerning Commandant Instruction 5355.1A. In that regard, the judge did not rationalize his finding that the Commandant's instruction was inapplicable nor was there evidence presented or judicially noted with respect to this finding. Presumably, the judge was convinced that the instruction was clear on its face as not applying to medical examinations. We, too, will examine it from that perspective, looking for indications of clear meaning within the four corners of the Instruction and any refer-

enced directives. In doing so, we follow the guidance of *U.S. v. Johnston*, 24 M.J. 271 (CMA 1987), that "[t]erms in a regulation must be interpreted in light of the regulatory context in which they are found and in view of the purpose of the regulation as a whole." *Id.* at 273.

At the outset, we note that the Commandant's Instruction does not expressly set out any limitations as to its applicability. In fact, the subject of the instruction is broadly stated as, "Drug Urinalysis Testing Procedures." Furthermore, the "Purpose" paragraph goes on in the same broad vein: "This instruction establishes Coast Guard-wide procedures for collecting, recording, and testing drug urinalysis samples and supplements the guidance contained in chapter 20 of reference (a) [the Coast Guard Personnel Manual]."

Looking at Chapter 20 of that Manual, we find that there are six general areas listed under the heading "Urinalysis" in Article 20–C–3: "(1) Administrative Inspections," "(2) Consent [Urinalysis]," "(3) Probable Cause [Urinalysis]," "(4) Valid Medical Purpose [Urinalysis]," "(5) Command Directed Screening," and "(6) Urinalysis Conducted in Conjunction with Training." Under the subheading, "Collection and Processing of Urine Specimens," where it could have been clearly stated that different procedures apply to the various general areas of urinalyses, if that was intended, it states, instead, that "(1) *[a]ll drug urinalysis specimens shall be collected and processed in accordance with Commandant Instruction 5355.1 (series)."* [Emphasis added.]

The only hint of a limitation on this broad exhortation appears in the "Discussion" paragraph of Commandant Instruction 5355.1A where it says, "Analysis of samples for the Coast Guard *in-service drug urinalysis program* is performed by a contract laboratory." [Emphasis added.] No further elaboration of what is meant by "in-service drug urinalysis program" is contained in the language of the documents. Arguably, while this language could be read to refer to those of the six areas that constitute a programmatic approach to drug detection, i.e. categories (1), (5) and (6), the phrase is just as susceptible to an interpretation covering all of the six areas. Moreover, the limited interpretation would present internal inconsistencies. We must conclude, therefore, that the Instruction does not on its face exclude medical examinations from its requirements.

We must look then to the very procedures established by the Instruction to determine if they were meant to be the only acceptable means of handling and processing urine samples within the Coast Guard. Those detailed procedures cover every phase of the process, including collection, testing, submission of reports, support documentation, provision of expert witnesses and billing. While not stating so explicitly, the clear thrust of the regulation is the establishment of a uniform method of drug urinalysis collection and testing in order that the results will be reliable enough for admission in evidence before courts and administrative forums. Article 20–C–3 of the referenced Personnel Manual, in fact, refers to the military rules of evidence throughout. While the reliability of medical tests is also of prime importance, if they are to be of any value to a physician, the primary goal of such tests is not the admission in evidence of the results. Moreover, it is not readily apparent why the Instruction's intricate procedure of labeling, logging and coordinating, would need to apply to the medically ordered testing of one individual, which may be the rule more often than not with respect to medical examinations. Furthermore, it is obvious that these procedures would introduce inappropriate delays in the treatment of a seriously ill or injured patient and be impossible to comply with if the patient were unconscious or otherwise incapable of participating.

 Despite the lack of express language excluding medical testing from the requirements of the Instruction, the involved process outlined therein for developing admissible evidence convinces us that it was not intended to cover medical tests. The Instruction's procedures are just too far removed from the operation of a medi-

cal facility or a doctor's office for it to have been intended to apply to drug tests directed by a physician for diagnostic purposes. Accordingly, we interpret the Commandant's Instruction in the same manner as the military judge and find that it did not apply to medical testing in the Coast Guard.[1] Even if it did apply, however, we believe, as indicated earlier, that the "wholesale" departures that were found did not necessarily require suppression of the evidence.

After hearing detailed testimony concerning collection and testing of appellant's urine, the judge found the results sufficiently reliable for consideration by the trier of fact. In so doing, he appears to have weighed the effect of departures from the procedures in the Commandant's Instruction on the reliability of the drug test for purposes of admissibility. We will now independently assess his admissibility conclusion, bearing in mind also the possible effect on reliability of the different procedures used for the instant medical tests. In so doing, we will apply the earlier quoted rule from the Court of Military Appeals decision in *Pollard, supra,* and will consider these procedural differences, along with all other factors, in determining reliability.

The judge expressed specific findings, which included the following facts. The enlisted health services technician at the Coast Guard Air Station medical clinic provided a sample bottle for the accused, after writing the accused's name, social security number and other identifying information on an attached label. Thereafter, the accused went into the head and returned the bottle and contents to the technician. The technician placed it in a plastic envelope, along with a SmithKline Bio–Science Laboratories outpatient test request form, sealed the plastic envelope and put it in a box for which only the technician and a courier from SmithKline held keys. The sample was picked up by a laboratory cour-

ier that day and SmithKline assigned an accession number to the bottle upon its receipt and followed other procedures used for handling samples under their protocol. Initial screening was done by enzyme immunoassay test (EMIT). The results were reported as presumptive positives with tetrahydro-cannabinol (THC) over 50 nanograms per milliliter and cocaine metabolite over 300 nanograms per milliliter. The sample was then tested for THC by gas chromatography/mass spectrometry (GCMS) with the same level standards applied for positive findings and the reported results were positive. The sample was initially confirmed by high performance thin layer chromatography (HPTLC) for cocaine metabolite, with a reported positive result and was later reconfirmed in May of 1989 by GCMS.

SmithKline through regular surveys and through an internal corporate program, performs both blind and nonblind proficiency tests on samples. After reviewing test results from October 88 through March 1989, the current director has found no false positives. While SmithKline is not certified by the National Institute of Drug Abuse (NIDA) or the Department of Defense (DOD), it is certified by the American College of Pathology and the State of Florida.

The judge specifically found that the procedures used in this case differed from the procedures required by Commandant Instruction 5355.1A in the following ways, among others:

(a) Environmental Health Research and Testing Laboratory, (EHRT), the only laboratory designated by the Commandant for urinalysis testing, was not used. Instead, SmithKline which is not certified by the Department of Defense for testing was utilized;

(b) Only one sample was obtained, rather than the two required by the Instruction;

---

1. Although not at issue in this case, there does not appear to be any compelling reason why the use of specified containers and the intricate labeling, logging and coordinating procedures should be required to establish the admissibility of a single urine sample collected from one individual, when obtained under the Personnel Manual's category (2) Consent or (3) Probable Cause. For the sake of clarity, the Commandant would be well advised to spell out in no uncertain terms the reach of this particular Instruction.

(c) The accused was not observed while providing a sample, as required by the Instruction;

(d) Bar code labels and required chain of custody forms were not used as prescribed by Commandant Instruction 5355.1A;

(e) An EMIT test instead of an radioimmunoassay (RIA) was used for the initial screen and no quantification was done of nanograms per milliliter.

The judge found the procedures used in this case were the same as those required by Commandant Instruction 5355.1A in at least the following ways:

(a) A certified laboratory was used, although not one certified by DOD;

(b) GCMS was used as a confirmatory test; and

(c) The standards for positive results for both cocaine and THC content were the same or higher than the standards for positive results in Commandant Instruction 5355.1A.[2]

Dr. Liu of EHRT Laboratories testified that his laboratory would not have released a result of positive based solely on the records that he reviewed. Dr. Chamberlain, the Director of SmithKline Bio–Science Laboratories, testified that he believed their test did establish the presence of THC and cocaine metabolite in the urine sample. SmithKline laboratories has as clients, corporations, hospitals, and health organizations.

Based on these facts, the qualifications of the witnesses, the procedures used by SmithKline laboratories as reflected in Prosecution Exhibits 7 through 16, and in consideration of MRE 312(f), the judge found that the handling and the testing of the urine sample provided by the accused were sufficiently reliable to admit the evidence for consideration by the trier of fact. Moreover, he also determined that its relevance did not appear to be outweighed by the danger of unfair prejudice in the case. As a result, the motion to suppress was denied.

Upon our independent assessment of the evidence presented on the motion, we have concluded that it fully supports the judge's findings of fact. Furthermore, considering the deviations from Commandant Instruction 5355.1A along with all of that evidence, we are convinced, pursuant to *U.S. v. Pollard, supra,* that the test results were sufficiently reliable for admission in evidence, as determined by the trial judge. Accordingly, the judge's ruling will not be disturbed and appellant's assignment of error is rejected.

After carefully reviewing the record of trial, we have determined the findings and sentence to be correct in law and fact, except for the confinement approved by the convening authority, as previously noted. Accordingly, the findings of guilty and so much of the sentence as provides for a Bad Conduct Discharge, confinement for two months, forfeiture of $200.00 per month for two months and reduction to pay grade E–1 are affirmed.

Judges BRIDGMAN and SHKOR concur.

---

**2.** We note that this is not a case where trial counsel attempted to use standards lower than those prescribed by Coast Guard directives, but

still scientifically supportable, to establish a "positive". *Cf. U.S. v. Arguello, supra.*