**UNITED STATES**

v.

**Major Gregg H. REINECKE, Military Judge, Appellee,**

**Airman First Class Harris K. Strozier, FR 214–66–7980, Real Party In Interest.**

**Misc. Dkt. No. 90A–03.**

U.S. Air Force Court of Military Review.

14 May 1990.

---

Appellate Counsel for the United States: Colonel Robert E. Giovagnoni; Major Paul H. Blackwell, Jr. and Captain Randy S. Chambers.

Appellate Counsel for the Appellee: Colonel Richard F. O'Hair and Captain Darla G. Orndorff.

Before Panel Three, LEONARD, MURDOCK and RIVES, Appellate Military Judges.

## DECISION

LEONARD, Senior Judge:

The government has appealed the military judge's rulings that the seizure of a urine specimen from Airman First Class Strozier was without probable cause and not covered by the good faith exception, that the handling of the urine specimen substantially violated Air Force regulations, and that the evidence derived from the urine specimen must be suppressed. We find that the military judge erred and overrule his suppression of Strozier's cocaine positive urinalysis.

Strozier was apprehended at Fort Lewis, Washington, on 25 September 1989, at 2129, for drunk and disorderly conduct. A computer check by the military police showed that Strozier was listed as absent without leave from the Air Force. The security police at McChord Air Force Base, Washington, were called and, at 2250, Strozier was released to their custody and they took him back to the base. Strozier was intoxicated and very uncooperative. Upon arriving at McChord, he was placed in a detention cell at the security police building.

Being concerned about Strozier's uncooperative and irrational behavior, the security police called the McChord Clinic to request a medical evaluation. The clinic sent two Emergency Medical Technicians (EMT), Staff Sergeant Eudy and Staff Sergeant Bush, to make a clinical assessment of Strozier's need for medical treatment. Eudy and Bush stayed with Strozier for approximately two hours attempting to keep him calm and examining him. They determined that Strozier's vital signs were normal with the exception of his pupils which were fixed and did not respond to light. Their experience and training as EMTs told them that when a person's pupils fail to react to light the cause is usually a brain injury or consumption of narcotics. Their examination of Strozier failed to find any head trauma that would support the theory of a brain injury. They also noted that during their period of observation, Strozier exhibited irrational behavior by hitting his head against the wall, continually rocking back and forth, ripping his shirt and attempting to choke himself with the draw string from his pants. Finally, they observed Strozier undergo a personality change and become increasingly paranoid.

Sergeant Lund, a security police investigator, was also present when the EMTs were making their examination and clinical assessment. All three individuals conferred and came to the conclusion, based on their training and experience, that Strozier's fixed pupils and irrational, paranoid behavior could not be explained solely by alcohol intoxication. They agreed that it appeared that Strozier was under the influence of some narcotic. During the examination by the military judge, Eudy admitted that he was not certain Strozier had taken an illegal drug and that some persons with extreme alcohol intoxication could exhibit some of the behavior they observed. He also stated that the conclusion of the EMTs was that it was "possible" that Strozier had used a narcotic.

While the EMTs and another security policemen transported Strozier to the Army hospital at Fort Lewis, Lund contacted Colonel McKinsey, the McChord Base Commander, to ask for authorization to seize urine and blood samples. The authorization was requested, at approximately 2400, in a three way telephone conversation involving Lund, McKinsey, and a judge advocate. Lund told McKinsey the circumstances of Strozier's apprehension at Fort Lewis and his transportation back to McChord. He also stated that Strozier was extremely belligerent and uncooperative, and had a strong odor of alcoholic beverage, slurred speech, and trouble walking, but at the same time was "hyper" and irrational. He told the commander that two EMTs had examined Strozier and had expressed the

opinion that he was under the influence of a narcotic based on his behavior and the fact that his pupils were fixed.

Colonel McKinsey was a former security police officer and had over 22 years of experience in that career field. During the three way conversation, he extensively questioned Lund on Strozier's behavior and the observations of Lund and the EMTs. Based on the information related to him and his own extensive experience with individuals intoxicated from alcohol and under the influence of illegal narcotics, he came to the conclusion that Strozier was probably under the influence of an illegal narcotic. In forming his conclusion, McKinsey considered the EMTs' observations of irrational behavior, an euphoric state, and fixed pupils and their opinion that Strozier might be under the influence of an illegal narcotic. He also considered Lund's observations that described some of the effects of alcohol, but also described a "hyper" or excited state and irrational and combative behavior that indicated the effects of a stimulant rather than alcohol. Further, based on his knowledge of how long evidence of illegal drug use remains in a person's body, he believed that tests of Strozier's blood and urine would still be able to identify the drug involved. Based on his conclusions, McKinsey determined that probable cause existed to seize blood and urine samples from Strozier and, with the concurrence of the on-call judge advocate, he ordered the seizure.

After the seizure was ordered, Office of Special Investigations (OSI) agents from McChord went to the Army hospital at Fort Lewis to obtain the samples. They took with them a 4½ oz screw top specimen container, commonly referred to as a wide mouth collection bottle, rather than the narrow mouth collection bottle that Air Force Regulation 160–23, *Drug Abuse Testing Program*, para. 7d(2)(b) (Feb 1989) provides to be used for collection of urine samples that are to be shipped to a drug testing lab. When they arrived, they found that Strozier had been given Valium to calm him and he was asleep. They gave the collection bottle to Staff Sergeant Hernandez, a security policeman who had been sent to guard Strozier and asked him to obtain the urine sample when Strozier regained consciousness.

When Strozier awoke, Hernandez observed him provide a urine sample in another bottle provided by a nurse and observed the nurse pour part of this sample into the bottle provided by the OSI. Hernandez screwed the lid on the bottle and placed a piece of tape over the top of it. The tape was not the tamper resistant tape that AFR 160–23, para. 7d(3) provides is to be placed over the top of urine sample bottles collected for shipment to a drug testing lab. Hernandez also completed an Air Force Form 52, Evidence Tag, describing the sample and showing that the sample was originally received by the nurse and transferred to him. Hernandez then kept the bottle under his constant observation and control until Special Agent Conoly arrived to take the bottle back to the McChord clinic.

Conoly sealed the bottle with evidence tape and put his signature and organization on the tape. He then receipted for the bottle on the Air Force Form 52 and took the bottle to the McChord clinic where it was released to Staff Sergeant Sullivan. Sullivan receipted for the bottle on the Form 52 and locked the bottle in a metal container. When the shift changed, the metal container was opened, Staff Sergeant Eudy receipted for the bottle, and the container was again locked. On both shifts, the only key to the locked container was kept in the possession of the person who had receipted for the bottle.

On the morning of 27 September 1989, Master Sergeant Cates, Superintendent of Laboratory Services for the McChord Clinic, receipted for the bottle, took it to the lab, and prepared it for shipment. Cates had previously served as the Noncommissioned Officer In Charge of the Air Force Drug Testing Laboratory (AFDTL) at Brooks Air Force Base Texas. This background made him very familiar with the required procedures under AFR 160–23 for shipment of urine samples to the AFDTL. As he was preparing the bottle for shipment, he noted that a number of procedural

requirements of that regulation had not been accomplished. Since the urine sample had been taken as a probable cause seizure, with chain of custody maintained on an evidence tag, Cates decided to treat the sample as a medical/legal sample under paragraph 50 of Air Force Regulation 160–12, *Professional Policies and Procedures* (Jun 1985). Cates signed the Form 52 and annotated it to reflect the bottle was sent by registered mail. He then completed a Department of Defense Form 1323, Toxicological Examination—Request and Report, addressed it to the Epidemiology Laboratory at Brooks Air Force Base, Texas, and put an entry in the chain of custody section of that form indicating that the bottle had been shipped by registered mail. He chose this procedure because he knew from his previous experience the Epidemiology Laboratory also processed drug test requests and they had the capability to detect more substances at lower levels of concentration than the AFDTL. He packed the bottle in a zip-loc bag with the Form 52 attached and placed the Form 1323 in a separate zip-loc bag to protect it in case the bottle leaked. The sample bottle and forms were boxed, sealed, labeled, and sent via registered mail to the Epidemiology Laboratory. When he sent the sample, Cates was unaware that, in March of 1989, the Epidemiology Laboratory was instructed to not process or test any more urine samples for illegal drugs because it was not Department of Defense certified as a drug testing laboratory.

The box containing Strozier's urine sample was received at the Epidemiology Laboratory by a Mr. Biggs. He found no signs of tampering with the box or its wrapping. Inside, he found the bottle with the Form 52 attached and the Form 1323. The bottle had leaked approximately one half of its contents, but the lid was still screwed on and the evidence tape was still in place and not broken. Biggs signed for the sample on the Form 52 and on the Form 1323, assigned a specimen number, and placed the bottle in a limited assess safe where specimens are kept under chain of custody.

At first, neither the AFDTL nor the Epidemiology Laboratory would test the sam-

ple. The Epidemiology Laboratory would not test it because of the March 1989 policy change. AFDTL would not test it because the procedures of AFR 160–23 had not been followed in collecting and shipping the sample. Specifically, the sample had been shipped in the wrong bottle and had leaked; the bottle was not correctly labeled with the collection date, base accession number, member's social security number, member's initials and observer's initials; and a Department of Defense Form 1323 had been used for chain of custody rather than the proper form—an Air Force Form 1890. The laboratory legal advisor was contacted to determine the disposition of the sample.

After discussing the situation with the staff judge advocate at McChord, the legal adviser requested that the sample be tested. The Epidemiology Laboratory tested the sample for ethanol alcohol and a variety of other drugs that the AFDTL does not test for. Their tests found the sample positive for ethanol alcohol and benzodiazepine, more commonly known by the trade name of Valium. The level of concentration of Valium was consistent with the dosage that Strozier had been given shortly after his arrival at the Fort Lewis Army Hospital.

On 11 October 1989, Biggs took 30ml of urine from the bottle to the AFDTL. Although this was less than the 60ml minimum that is required to be provided under AR 160–23, para. 7, the AFDTL receipted for the sample on the Form 1890 that Biggs had prepared to accompany the sample. The sample was tested by the AFDTL under normal Department of Defense certified procedures and was found to be positive for cocaine.

At trial, the defense moved to suppress the cocaine positive urinalysis on two grounds. First, they maintained that the base commander lacked probable cause to order the seizure of a sample of urine from Strozier. The second ground was failure to follow regulatory procedures in obtaining and handling the urine sample.

I

The military judge did not make separate essential findings of fact. He did inter-

sperse a few findings of fact in his conclusions of law. Specifically, he found that there was no break in the chain of custody of Strozier's urine sample and that the sample tested by the two laboratories was Strozier's. He found that the sample should have been processed under the procedures of AFR 160–23 rather than AFR 160–12. He found "gross deviations" from the requirements of AFR 160–23 regarding the labeling of the sample, the use of the wrong container, the lack of tamper resistant tape, and in providing less than the required amount of urine for testing at the AFDTL. He further found that, if the the sample had been originally submitted under AFR 160–23, it would have been returned without testing because of the discrepancies. With respect to lack of probable cause, the military judge made only one identifiable finding. He found that Colonel McKinsey was conscientious, thoughtful and reflective. We find none of these limited findings of fact clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985).

■ When ruling on motions to suppress evidence, military judges are required to state their essential findings of fact on the record. Mil.R.Evid. 311(d)(4); R.C.M. 905(d). These findings should be stated separately and succinctly so the reader knows precisely the facts found which are relevant to and support the legal decision. *United States v. Watts*, 21 M.J. 728 (N.M. C.M.R.1985); *United States v. Postle*, 20 M.J. 632 (N.M.C.M.R.1985). The findings should be logical and complete enough so that there is no need to resort to other parts of the record for their meaning. 21 M.J. at 729. After stating the findings of fact, the military judge should state the legal basis for the decision, that is, the legal standards applied and the analysis of the application of these standards to the facts previously stated. *Id.* Finally, the military judge should state any conclusions made and the decision.

Without a proper statement of essential findings, it is very difficult for an appellate court to determine the facts relied upon, whether the appropriate legal standards were applied or misapplied, and whether the decision amounts to an abuse of discretion or legal error. 20 M.J. at 640.

■ Lack of essential findings can be especially crucial in a case such as this one that comes before us on government appeal. In resolving government appeals, courts of military review do not have the fact finding powers that they normally possess. Article 62(b); 20 M.J. at 640; R.C.M. 908(c)(2). However, we will not prolong the case further by remanding for essential findings. The accused has been in pretrial confinement since 5 January 1990 and the facts in this case are not disputed by the parties.

■ The military judge set forth the legal standards he considered, his analysis of those standards, and his conclusions. We will decide this case based upon those statements and the limited facts that were found by him. Our task is to determine whether the military judge correctly applied the proper legal standards and the correctness of his ruling as a matter of law. Article 62(b), UCMJ, 10 U.S.C. § 862(b); *United States v. Lewis*, 19 M.J. 869 (A.F.C.M.R.1985). A military judge's determination of an issue of admissibility of evidence should not be disturbed on review unless it constitutes a clear abuse of discretion. *United States v. Jenkins*, 27 M.J. 209, 211 (C.M.A.1988); *United States v. Jones*, 25 M.J. 567 (A.F.C.M.R.1987).

■ In determining the issue of probable cause to seize the urine sample, the military judge found that the information presented to Colonel McKinsey was not sufficient to satisfy the "totality of the circumstances" test for probable cause. *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983); *United States v. Johnson*, 23 M.J. 209 (C.M.A. 1987). The question of whether a reasonable person in the position of the commander could have concluded from the information given him that probable cause existed is a question of law. 23 M.J. at 211. There is nothing in the record to indicate any dispute as to the information received by the commander. Further, there is no claim that false information was intention-

ally presented to him by Sergeant Lund. If either of these issues had been raised, we would have needed specific findings of fact before we could proceed.

The military judge disagreed with McKinsey's determination of probable cause because, in the military judge's opinion, McKinsey was not presented enough information to make a probable cause determination. Further, the military judge stated that McKinsey placed too much emphasis on the dichotomy between the part of Strozier's behavior which was consistent with alcohol intoxication and the portions which were inconsistent with alcohol intoxication without knowing when and how much alcohol was consumed. The military judge also disagreed with McKinsey placing significant emphasis upon the fact Strozier had fixed pupils without knowing what his other vital signs were. When pressed by the trial counsel to be more specific about his ruling, the military judge stated that he also saw a problem with the basis of the knowledge of the affiant and that he was substituting his judgment for Colonel McKinsey's judgment at the time he authorized the seizure.

Probable cause to search or seize exists "when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Mil.R.Evid. 315(f)(2). A determination of probable cause shall be based upon any or all of the following:

 (A) Written statements communicated to the authorizing officer;

 (B) Oral statements communicated to the authorizing official in person, via telephone, or by other appropriate means of communication; or

 (C) Such information as may be known by the authorizing official that would not preclude the officer from acting in an impartial fashion.

Mil.R.Evid. 315(f)(2).

■ A crucial factor the military judge overlooked in analyzing Col McKinsey's determination of probable cause was the last source of probable cause listed above. In substituting his own judgement for that of Colonel McKinsey, he neglected to consider

that Colonel McKinsey could consider his 22 years of security police experience in dealing with drunks and persons under the influence of illegal drugs in making his decision as to whether probable cause existed. *United States v. Baur*, 10 M.J. 789 (A.F.C.M.R.1981); Mil.R.Evid. 315(f)(2)(C).

The test the military judge should have applied was whether a reasonable person in the position of the commander, applying his common sense and experience, could have concluded from the information given him, under the "totality of the circumstances" present, that probable cause existed to seize the urine and blood samples. 462 U.S. at 233, 103 S.Ct. at 2329; 23 M.J. at 211, 212; 10 M.J. at 791; *United States v. Conquest*, 8 M.J. 741 (A.F.C.M.R.1980); Mil.R.Evid. 315(f)(2)(C).

■ Colonel McKinsey was told the circumstances of Strozier's apprehension and detention, his physical condition and behavior while in detention, his fixed pupils and "hyper state," and the opinions of the EMTs and the security policeman who observed him. He asked a number of questions to clarify the information, applied his own experience and background to the information, and consulted with a judge advocate to arrive at a well-reasoned opinion that probable cause existed. Applying the "totality of circumstances" analysis to the information he relied upon, we are satisfied that Colonel McKinsey properly found probable cause to order seizures of urine and blood samples from Strozier.

■ We do not find any problem with the "knowledge of the affiant" hinted at by the military judge in his ruling. Reading the military judge's ruling closely, we believe the military judge's opinion was that the EMTs and Lund did not possess enough knowledge to express an opinion that Strozier might be under the influence of an illegal drug. We disagree. They were entitled to rely on their observations, experience, and training to form an opinion as to the reason for Strozier's physical condition and behavior. Additionally, Colonel McKinsey was entitled to consider their opinions in making his probable cause deci-

sion. *United States v. Powell,* 7 M.J. 435 (C.M.A.1979); *United States v. Conquest,* 8 M.J. 741 (A.F.C.M.R.1980).

Further, we find this case distinguishable from the *Shepherd* case cited by appellate defense counsel. In *Shepherd,* the commander was not provided any "articulable indicia whereby a trained observer might surmise" that the observed behavior was caused by recent use of an illegal drug. *United States v. Shepherd,* 24 M.J. 596, 598 (A.F.C.M.R.1987) (the information presented the commander was that Shepherd was asleep on duty, had a faint odor of alcohol, and could not be aroused). In this case, we have the opinions of trained medical and law enforcement personnel, based on their observations of behavior inconsistent with alcohol intoxication and a physical condition indicative of drug use. Further, Colonel McKinsey had training and experience that enabled him to arrive independently at an opinion based on the articulated indicia. Thus, more than mere suspicion of illegal drug use was present to support Colonel McKinsey's probable cause determination. Therefore, we find the military judge abused his discretion in granting the motion to suppress based on a lack of probable cause to seize Strozier's urine sample.

## II

The second basis for the military judge's decision to suppress the positive urinalysis was the government's failure to follow regulatory procedures in obtaining and processing Strozier's urine sample. Despite his findings that there was no gap in the chain of custody of the sample and that the urine sample found to be positive belonged to Strozier, he found the discrepancies in processing to be "gross deviations" warranting suppression of the test results. The decision was based on the provisions of Air Force Regulation 30–2, *Social Actions Program,* chapter 5 (Apr 1986), AFR 160–23, and *United States v. Pollard,* 27 M.J. 376 (C.M.A.1989). The military judge stated that he viewed AFR 30–2 and AFR 160–23 to be "designed to ensure that this system which can be subject to criticism is a system based on integrity in processing

these samples." He cited the *Pollard* case as standing for the proposition that "the military judge may exclude drug test results, if he finds there has been a substantial violation of regulations intended to ensure reliability of the testing procedures."

■ We agree with the military judge's assessment of the reason for the regulatory provisions he cites; however, we do not agree that these provisions require exclusion of test results merely because urine samples are not processed in compliance with them. There is no indication in either regulation that failure to follow the procedures set forth should result in an inability to use the result of an urinalysis in an administrative or disciplinary action.

Further, we do not interpret the *Pollard* case in the same way as the military judge. In *Pollard,* a Coast Guard military judge granted an accused's motion to suppress the test results on a urine sample that had not been collected properly under Coast Guard instructions. Specifically, the regulatory sequence for affixing the label and tamper proof seal to the urine bottle were not followed and the observer did not, as required, initial the chain of custody forms.

In reversing the military judge's ruling, the United States Coast Guard Court of Military Review found that there was no constitutional requirement to suppress evidence because of a "failure to follow every internal rule." *United States v. Pollard,* 26 M.J. 947, 950 (C.G.C.M.R.1988). In upholding the Court of Military Review, Judge Cox elaborated on the effect of regulatory violations on the admissibility of urine test results:

We hold that deviating from a regulation or instruction which sets out procedures for collecting, transmitting, or testing urine samples does not render a sample inadmissible as a matter of law; however, such deviation may be considered along with all other factors in determining if the evidence *lacks sufficient reliability to be considered by the finders of fact.* (Citations omitted). As is the case with all other evidence proffered under the Military Rules of Evidence, the mili-

tary judge is responsible for determining if the finders of fact, *i.e.*, the court-martial, can *reasonably decide whether a urine sample originated from appellant and was tested without adulteration by any intervening agent or cause.* *Pollard,* 27 M.J. at 377 (emphasis added).

 The military judge was correct in concluding that, in the appropriate case, a military judge may suppress drug-test results for substantial violations of regulatory provisions intended to insure the reliability of the testing procedures. *Id.* However, we interpret the holding of *Pollard* to be that suppression of drug-test results should be limited to those cases where the violations cause the test results to lack "sufficient reliability to be considered by the finders of fact." *Id.* In determining if the drug-test results lack such "reliability" the military judge should determine whether a fact finder could "reasonably decide whether a urine sample originated from appellant and was tested without adulteration by any intervening agent or cause." *Id.*

Some of the regulatory provisions violated in this case were obviously designed to insure the integrity of a drug sample taken by inspection testing. When a number of samples are taken at the same time, it becomes extremely important to insure that samples are not mixed up or contaminated by another sample. However, when only one sample is taken as a probable cause sample, the need for these procedures is not as critical because there are no other samples that could contaminate or be confused with the probable cause sample. In this case an evidence tag was attached to the bottle and evidence tape and a clear tape were used to seal the bottle. These procedures were certainly sufficient to clearly identify the sample, maintain an accurate record of the chain of custody, and insure the sample was not subject to tampering.

The use of a wide mouth collection bottle rather than the standard narrow mouth bottle had no impact at all on the reliability of the evidence. Sergeant Cates testified that the wide mouth bottle is not an approved bottle because it leaks. Use of bottles that leak would be a serious discrepancy in maintaining integrity of samples when a number of samples are shipped together. However, when only one sample is shipped, a leaking bottle does not compromise the sample. There was no possibility Strozier's sample could be contaminated by another specimen. Further, knowing the bottle would probably leak, Cates took care to enclose it in a separate zip-loc bag to protect the chain of custody documents. Finally, although the sample leaked, there was still enough remaining in the bottle to test.

Use of the wrong chain of custody document also had no prejudicial impact on the reliability of the evidence. In fact, a normal sample submitted under the provisions of AFR 160–23 has chain of custody maintained on only one document—an Air Force Form 1890. Strozier's sample had its chain of custody protected by two documents—a Department of Defense Form 1323 and an evidence tag. These documents, and the Air Force Form 1890 used by Mr. Biggs when he took a portion of the sample to the AFDTL, clearly show, as the military judge found, there was no gap in the chain of custody for Strozier's urine sample.

Finally, another factor provided additional reliability for Strozier's urine sample. By having the sample mistakenly sent to the Epidemiology Laboratory, it was subjected to an additional test that proved it was Strozier's sample. The sample was found positive for an amount of Benzodiazepine (Valium) that was consistent with the dosage of this drug given Strozier shortly after his arrival at the Fort Lewis Army Hospital. This additional proof of the integrity of the sample's processing supports the military judge's final finding that the sample tested was Strozier's sample.

Considering all the evidence presented to the military judge, it is clear that the urine sample "originated" from Strozier and "was tested without adulteration by any intervening agent or cause." 27 M.J. at 377. Therefore, the positive drug-test result on Strozier's sample did not lack suffi-

cient reliability to be considered by the finders of fact. *Id.* We find that the military judge misapplied the appropriate legal standards and abused his discretion in granting the motion to suppress for failure to follow regulatory procedures in the collection and processing of Strozier's urine sample.

The Government's appeal is granted and the ruling of the military judge to suppress the positive drug-test results on the sample obtained from Airman First Class Strozier is reversed. The record of trial is returned to the convening authority.

Senior Judge MURDOCK and Judge RIVES concur.