UNITED STATES, Appellee,

v.

Harris K. STROZIER, Airman First
Class, U.S. Air Force, Appellant.

Misc. Dkt. No. 90–14.
CMR Dkt. No. 90A–03.

U.S. Court of Military Appeals.

Argued July 31, 1990.

Decided Sept. 28, 1990.

For Appellant: *Captain Darla G. Orn-
dorff* (argued); *Colonel Richard F. O'Hair*
(on brief).

For Appellee: *Major Paul H. Blackwell*
(argued); *Colonel Robert E. Giovagnoni*
and *Captain Randy S. Chambers* (on
brief).

*Opinion of the Court*

COX, Judge:

Appellant was arrested and subsequently
placed in pretrial confinement in January 5,
1990, where he remains to this date. A
general court-martial was initiated against
him in February 1990 at McChord Air
Force Base, Washington. Appellant is
charged with a single specification of
wrongful use of cocaine, in violation of
Article 112a, Uniform Code of Military Jus-
tice, 10 USC § 912a. Prior to entering

pleas, defense counsel moved to suppress appellant's urinalysis results forming the basis of the Charge on two grounds, as follows:

That the Government failed to follow applicable Air Force and Department of Defense Regulations in the collection, retention, and testing of appellant's sample; and,

2. That the Government did not have probable cause to seize appellant's urine.

Ruling in favor of the defense on both grounds, the military judge granted the motion to suppress. Pursuant to Article 62, UCMJ, 10 USC § 862, the Government appealed the military judge's decision to the Court of Military Review. On May 14, that court reversed the judge's ruling and returned the record of trial to the convening authority to proceed with trial. 30 MJ 1010.

Appellant subsequently filed a motion to stay court-martial proceedings and a petition for grant of review before this Court, seeking relief from the decision the court below. The motion and the petition were granted on July 3, 1990.

The issues presented for our review by appellant ask:

I

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN THEY REVERSED THE FINDINGS OF THE MILITARY JUDGE IN SUPPRESSING A URINALYSIS RESULT WHEN THE GOVERNMENT FAILED TO FOLLOW ANY OF THE PROCEDURES OUTLINED IN AFR 160–23.

II

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN THEY REVERSED THE FINDINGS OF THE MILITARY JUDGE WHO FOUND THE MAGISTRATE WAS GIVEN INSUFFICIENT INDICIA OF PROBABLE CAUSE TO ORDER A

SEARCH AND SEIZURE OF APPELLANT'S URINE.

Appellant was apprehended on September 25, 1989, by Army military police assigned to Fort Lewis, Washington, for drunk and disorderly conduct. The policemen also determined that appellant was absent without leave. Security police from McChord AFB went to Fort Lewis, took custody of appellant, and returned him to McChord, where he was placed in a detention cell. Because he appeared to be heavily intoxicated, the policemen called emergency medical technicians for assistance in determining whether appellant needed any medical attention.

One of the technicians, Staff Sergeant Eudy, observed appellant for about 2 hours. During that time, appellant was extremely combative and acted paranoid; at one point he attempted to choke himself with a drawstring. Taking vital signs, Sergeant Eudy noticed that appellant's pupils were fixed and failed to respond to light. Eudy relayed this information, together with his opinion that appellant could possibly be under the influence of narcotics, to Sergeant Lund, a security police investigator. Sergeant Lund, in turn, relayed the information to Colonel McKinsey, the base commander, and asked for a search-and-seizure order to obtain appellant's urine for a probable-cause urinalysis. After a conference call between Colonel McKinsey, Sergeant Lund, and Captain Kurlander, a judge advocate assigned to the base legal office, the Colonel determined that he had probable cause to seize appellant's urine for testing, and he ordered that a sample be taken. Because of his intoxicated state, appellant was moved to the base hospital; however, a urine specimen was not drawn until the afternoon of September 26.

The facts, found by the military judge at trial and conceded by the Government on appeal, show that there were a significant number of deviations from Air Force Regulation (AFR) 160–23 (31 July 1986), entitled "Drug Abuse Testing Program," in the collection, transmission, and testing of appellant's urine.

At the hospital, Staff Sergeant Hernandez, another security policeman, watched as appellant provided his urine for testing. He had appellant deposit the sample in a cup with a plastic lid, rather than in a urine-specimen bottle, as required by AFR 160–23. Additionally, the sergeant failed: to seal the container with tamper-resistant tape; to have appellant observe him seal the container; to have appellant initial the container; and to initial the container himself. Compliance with all of these actions is prescribed by the regulation.

Other discrepancies in the chain of custody included the fact that the sample was not correctly labeled with the collection date, the base accession number, the member's social security number, the member's initials, and the observer's initials. Para. 7(d)(3), AFR 160–23. Also Sergeant Hernandez and other chain-of-custody witnesses acknowledged that improper documentation was used. Specifically, Sergeant Hernandez began the chain of custody with an AF Form 52, a generic evidence tag, while AFR 160–23 expressly requires that AF Form 1890, "Urinalysis Custody and Record Report" (a ledger), be used to document when and where the sample was taken. Para. 7, AFR 160–23. Sergeant Hernandez filled out the AF Form 52 and tied it to the cup. At trial, he could not recall whether he or a nurse sealed the cup with a piece of tape. He then gave the cup to Special Agent Conoly of the Office of Special Investigations, and Agent Conoly gave it to "[a] guy named Sullivan," who also signed the AF Form 52 and secured the urine sample.

The sample eventually was given to the superintendent of laboratory services at McChord AFB, Master Sergeant Cates. He previously had served as the noncommissioned officer in charge at the Air Force Drug Testing Laboratory (AFDTL), Brooks AFB, Texas, where the urine sample eventually would have to be sent for testing. He was very familiar with the procedures for handling urine samples mandated by AFR 160–23. Specifically, he knew that the urine sample was not in an approved specimen bottle and would not be tested by AFDTL. Thus, he sought to have the urine tested for controlled substances at the Epidemiology (EPI) Laboratory, which was also at Brooks AFB.

Before sending the container to EPI, Sergeant Cates did attempt to bring the collection and transmission of the sample into more compliance with AFR 160–23. In particular, he filled out a DD form 1323, "Toxicological Examination–Request and Report." This form, however, is required for urine samples tested only for medical purposes under a different regulation: AFR 160–12. Before shipping the sample, he placed the form in a zip-loc bag, separate from the urine sample. On direct-examination, he acknowledged that his reason for doing so was that "samples of this manner have a tendency to leak when you are shipping them." He sent the urine to EPI via registered mail.

On October 2, EPI received the package containing appellant's urine. Cates had called ahead to make sure they would test the sample, but was told that they would not because they were not authorized to do so. EPI performs urinalyses for medical purposes, only under AFR 160–12, which has different procedures for collecting and shipping urine specimens. In March 1989, it had been determined that no urine samples would be tested there for use at courts-martial because the laboratory was not certified for such testing by the Department of Defense.

After EPI received the package and refused to test it, Sergeant Cates contacted the Armed Forces Institute of Pathology in Washington, D.C., to see if the urine could be tested there. He was told that they would not test it because of the irregularities in the way it was packaged and shipped, and because it had already been received at another lab. According to Cates, the staff judge advocate at McChord AFB had a phone conference with the SJA at AFDTL to determine what could be done with the urine sample. Cates did not know the content of the conversations, but he

was told that AFDTL agreed to test appellant's urine specimen.

When the mailing box containing the urine sample arrived at EPI, it was opened by a chemist named Biggs. Mr. Biggs found that the seal on the sample bottle had not worked and that the urine had leaked from the cup. According to Mr. Biggs, the chain-of-custody document, the AF Form 52, "was pretty well soaked."

On October 11, Mr. Biggs took the remaining 30 milliliters (mL) of urine left in the cup over to AFDTL for testing.* Paragraph 7d(3), AFR 160–23, requires that the urine testing program monitor

> ensures the urine volume is 60 mL or more.... If there is inadequate volume and the member is unable to immediately supply the needed quantity, discard the specimen bottle and notify the person's commander, supervisor or commander's designee.

Para. 8c(2) of AFR 160–23 states:

> Any bottle that contains less than 60 mL of urine, appears to contain an adulterated specimen, or has any major discrepancy in the chain of custody *is not tested.*

(Emphasis added.) It was not until October 12 that Sergeant Cates at McChord AFB accounted for the sample on an AF Form 1890, as required by AFR 160–23. The sample was tested by AFDTL and the results were positive for cocaine.

The military judge stated in his essential findings that he determined that Colonel McKinsey did not have probable cause to order appellant's urine to be seized. He acknowledged that he did not dispute what evidence was available to Colonel McKinsey when he made his determination and that he was in fact substituting his judgment for Colonel McKinsey's at the time the order was issued for a probable-cause urinalysis. The military judge opined that the circumstances related to Colonel McKinsey rose only to "mere suspicion."

Regarding the procedures used in the collection, shipment, and testing of appellant's urine, the military judge stated:

> The chain of custody was good, although it could have been better....
>
> [A]bsent [AFR] ... 160–23, I would tend to agree with the Government that those factors, after finding a good chain of custody with no gap, goes to the weight of the evidence, not the admissibility of the evidence. However, I'm still granting the defense motion to suppress the evidence.... *I'm relying on the language from the U.S. Court of Military Appeals appearing at page 377 of the case of U.S. versus Pollard.*
>
> Specifically, *"Obviously the military judge may exclude drug test results, if he finds there has been a substantial violation of regulations intended to ensure reliability of the testing procedures." I think that's precisely the situation we're in here. ...*

In essence, what that's saying to me in *Pollard* is that although minor deviations or deviations are not, *per se,* reasons for excluding the evidence, it would seem to indicate that that would be the situation where the Government is at least in the ball park in initially processing it. And in this case, the Government was clearly out of the ball park in processing it.

\*      \*      \*      \*      \*      \*

> As pointed out by the defense ... *there were gross deviations from the requirement of Air Force Regulation 160–23. For instance ... in the labeling of it, and the use of the nonspecified container, regarding the amounts of the substance that eventually got to the drug testing lab for testing, which I admit was accomplished, that was one half of the specified amount. It should have been 60 milliliters. It was ultimately 30 milliliters. There was no tamper resistant tape. Those are fairly gross discrepancies. ...*

---

* On October 10, Mr. Biggs withdrew 22 ml of the sample and determined that the urine contained some ethyl alcohol and benzodiazepine, more commonly known as valium. Appellant had been given valium when he was admitted to the hospital, in an effort to calm him down.

In this case, the Government seems to argue that we're not even in the right ball park in the way we started under [AFR] 160–12 and, yet, we're going to be able to bootstrap it and, in essence, ignore all the procedural and regulatory safeguards under [AFR] 160–23 and use this as evidence in a court-martial. And that seems to me to be an anomaly and a position that I, as a trial judge am not going to accept.

(Emphasis added.)

■ We note initially that we do not disagree with the Court of Military Review decision as it reverses the military judge's finding that no probable cause existed to order appellant's urine to be seized. The question regarding probable cause before the Court of Military Review was "one of law, rather than fact—namely, whether a reasonable person in the position of the commander could have concluded from the information given him that probable cause existed to believe" that appellant had ingested a controlled substance. *United States v. Johnson*, 23 MJ 209, 211 (CMA 1987). There was no question of whether certain information had been given to Colonel McKinsey and there was no claim that any false information had been presented to him. *Id.* at 211–12. Under the "totality-of-the-circumstances" analysis permitted by *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983), we are satisfied that there was probable cause for Colonel McKinsey to order appellant's urine to be seized and tested.

■ With regard to the military judge's findings of "gross deviations" and "gross discrepancies" in the procedures used to collect and eventually test appellant's urine sample, we construe these to be questions of fact. Determinations of fact which are fairly supported by the record should not be disturbed unless they are unsupported by the evidence or are clearly erroneous. *United States v. Burris*, 21 MJ 140, 144 (CMA 1985). Apparently, the Court of Military Review agreed, stating that it found "none of ... [the military judge's] limited findings of fact

clearly erroneous." 30 MJ at 1015 (citing *Burris*). Yet the court below chose to reverse the judge's ruling.

■ The Court of Military Review stated that it "interpret[ed] the holding of *Pollard* to be that suppression of drug-test results should be limited to those cases where the violations cause the test results to lack 'sufficient reliability to be considered by the finders of fact.'" *Id.* at 1018. The court, in opining that the military judge in this case erred as a matter of law in his interpretation of our holding in *United States v. Pollard*, 27 MJ 376 (CMA 1989), concluded:

[T]he military judge misapplied the appropriate legal standards and abused his discretion in granting the motion to suppress for failure to follow regulatory procedures in the collection and processing of Strozier's urine sample.

30 MJ at 1019.

In *Pollard* we held:

[D]eviating from a regulation or instruction which sets out procedures for collecting, transmitting, or testing urine samples does not render a sample inadmissible as a matter of law; however, such deviation may be considered along with other factors in determining if the evidence lacks sufficient reliability to be considered by the finders of fact. *See United States v. Caceres, supra* [440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979)]; *United States v. Holsworth*, 7 MJ 184 (CMA 1979). As is the case with all other evidence proffered under the Military Rules of Evidence, the military judge is responsible for determining if the finders of fact, *i.e.*, the court-martial, can reasonably decide whether a urine sample originated from appellant and was tested without adulteration by any intervening agent or cause. *Obviously, the military judge may exclude drug-test results if he finds there has been a substantial violation of regulations intended to assure reliability of the testing procedures.*

*Id.* at 377 (emphasis added).

We disagree with the holding below that the military judge misapplied our holding

from *Pollard.* The judge expressly recognized that under *Pollard,* technical or minor deviations do not *per se* render a urine sample inadmissible. However, he rejected the Government's suggestion that evidence could be used at a court-martial even though there were gross deviations from its own self-imposed procedural safeguards. In *Pollard,* we stated in a footnote that the case was "limited to the test of admissibility based upon technical violations in the procedures for collection, transmission, or testing a urine sample." We added, however, that we would "not exclude the possibility that *a military judge might be constrained to find a sample inadmissible because of violations of these procedures."* *Id.* at 377 n.3 (emphasis added). We believe this to be such a case. *See also United States v. Arguello,* 29 MJ 198 (CMA 1989). As we recently held in *Arguello:* "[T]he Government established a regulatory standard for determining when urinalysis *reliably* and fairly showed the use of" a controlled substance "by a servicemember. *See* Mil.R.Evid. 402." *Id.* at 206 (emphasis added). We

hold, consistent with *Pollard,* that the same notion of reliability, and ultimately relevance, applies to the collection, transmission, and testing of a urine sample. The military judge's ruling, therefore, was not erroneous as a matter of law.

As the military judge applied the correct legal standard, the only issue was whether, under *Pollard,* there had been a "substantial violation of regulations intended to assure reliability of the testing procedures." 27 MJ at 377. As we stated above, these were questions of fact. Giving due deference to the trial bench, the judge's determination in this case was supported by the evidence and should not have been disturbed on appeal. *United States v. Burris, supra.*

The decision of the United States Air Force Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for implementation of the judge's ruling.

Chief Judge EVERETT and Judge SULLIVAN concur.