**UNITED STATES, Appellant**

v.

**Sergeant Keith HENRY, 421–11–5106, United States Army, Appellee.**

**ARMY MISC 9402015.**

Army Court of Criminal Appeals

25 April 1995.

---

* Chief Judge Thomas R. Cuthbert took final action in this case prior to his reassignment.

For Appellant: Captain Michael E. Mulligan, JAGC (argued); Colonel John M. Smith, JAGC, Major Lyle D. Jentzer, JAGC, Major James P. Calve, JAGC, Captain John P. Saunders, JAGC, Captain Joel B. Miller, JAGC (on brief).

For Appellee: Captain James W. Friend, JAGC (argued); Major Fran W. Walterhouse, JAGC (on brief).

Before EDWARDS, CAIRNS, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT

GONZALES, Judge:

The accused in this case is on trial for the alleged rape of his stepdaughter in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (1988) [hereinafter UCMJ]. The United States has filed a timely appeal with this court pursuant to Article 62, UCMJ, contending that the military judge erroneously suppressed the out-of-court hearsay statements made by the alleged rape victim to two medical doctors during a rape protocol examination. At an Article 39(a), UCMJ, hearing, the military judge heard evidence and arguments concerning the admissibility of the subject evidence against the accused, who is also charged with forcible sodomy, aggravated assault, indecent assault, and adultery in violation of Articles 125, 128, and 134, UCMJ, 10 U.S.C. §§ 925, 928, and 934. The military judge determined that the statements were not admissible under the medical diagnosis or treatment hearsay exception under Military Rule of Evidence 803(4) [hereinafter Mil.R.Evid.]. We find no error and decline to grant the relief requested.

### I. Background

On 6 August 1994, SR, the fifteen-year-old daughter of Mrs. Henry, told her mother that the accused, Mrs. Henry's husband and SR's stepfather, had raped her earlier that same day. Mrs. Henry took SR to Staff Sergeant (SSG) Rivera's quarters looking for

Mrs. Dean, a close friend. Although Mrs. Dean was not there, SSG Rivera invited them into his quarters. When Mrs. Henry told him what her daughter had told her, SSG Rivera called the military police. Mrs. Henry and SR were subsequently taken to the Criminal Investigation Command (CID) office, where each provided a sworn statement to different CID agents.[1]

Since there was no medical facility at Wiesbaden, Germany, two CID agents drove Mrs. Henry and SR to the Landstuhl Army Regional Medical Center.[2] Colonel (COL) Robichaux, the on-call social worker, was the first to speak with SR. He testified that he told her that he would be her advocate in determining what kind of medical exam was needed and what kind of psychological treatment would be provided to her. In conjunction with his introduction, Mrs. Henry signed a consent form requesting and authorizing medical personnel at Landstuhl to conduct such medicolegal examination and clinical procedures on her minor daughter as were needed.[3] Mrs. Henry also signed the form a second time where she requested and authorized the taking of photographs of her daughter's bodily injuries sustained during the course of an assault. SR only signed the form where she authorized the taking of photographs of her injuries sustained during the course of an assault. Colonel Robichaux indicated that SR did not want to be examined by a male doctor; she wanted a female doctor to conduct the medical examination.

He convinced SR to allow Doctor (Dr.) Semancik, a male pediatrician, to examine her.

Doctor Semancik testified that he explained to SR that he needed "to examine her to make sure she had no injuries" and "to ask her a few questions so that I knew what sort of exam to do." He also told her that, "the purpose of asking her questions was so that I could help her ... with anything physical ... or psychological." He had the impression that he had satisfactorily conveyed his concerns for SR to her. According to Dr. Semancik, SR "asked questions about what sort of exam was going to be done to her" and "what she might be expecting during the physical exam portion."[4] In response to his questions, Dr. Semancik testified that SR told him how the alleged rape occurred.

[O]n the day prior to me seeing her, her step-father had taken her in the car to get her bike repaired. On the way in the car, they had stopped at a store of some sort and he bought a box of condoms. At that point he drove her to a secluded, wooded area and told her to get into the back seat of the car and to remove her panties. And she said that, after she did that, he got on top of her and put a condom on and had sexual intercourse with her.... She said that afterwards he threw the condom out the window of the car, and that they never did go get her bike fixed. After that they returned home and she didn't say anything

1. It is a common occurrence for a child abuse victim to be interviewed by CID agents before being seen by a medical doctor. This fact alone does not undermine the admissibility of medical statements under Mil.R.Evid. 803(4). We note that both the leading military and federal cases discussing the two-pronged approach to admissibility of statements under Military and Federal Rule of Evidence 803(4) involve child-victims who were first interviewed by a law enforcement officer before being taken to a physician for examination. *United States v. Edens*, 31 M.J. 267 (C.M.A.1990); *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980); *see also United States v. Fling*, 40 M.J. 847 (A.F.C.M.R.1994) (the child-victim was taken to the base clinic for examination by three agents of the Air Force Office of Special Investigations).

2. In *United States v. Ureta*, 41 M.J. 571 (A.F.Ct. Crim.App.1994), agents of the Air Force Office of Special Investigations first asked the alleged rape

victim, the adolescent daughter of the accused, if she would consent to a medical examination prior to taking her to the hospital, which she did. Had SR been asked if she desired medical treatment, her answer would have been evidence as to whether she wanted to be taken to Landstuhl for medical treatment.

3. This form is the first page of Appellate Exhibit XVII.

4. Doctor Semancik was not asked any follow-up questions that could have shown more clearly that he explained to SR that he was making medical decisions based on what SR told him and that he answered SR's questions by explaining that she could "expect" him to provide her with an appropriate medical examination. Such evidence would have been helpful to determine whether SR had "some expectation of receiving a medical benefit."

to anyone until her mother found a pair of panties of hers that had some blood in them and that the mom asked her what had happened; and at that point she revealed to her mother the same thing that she revealed to me.

The results of the examination were that SR had lacerations of her hymen which were consistent with what she told Dr. Semancik and Colonel Robichaux. She also had some faint bruises on the inner thighs and some bruising on the neck. Both doctors annotated the information provided by SR and Mrs. Henry in their separate reports. Present during the medical examination in addition to Mrs. Henry was a female CID agent, who took pictures and who asked SR, "Is that the same as what you told me?"[5]

SR testified that she did not ask anyone to take her to the hospital. She and her mother went to the hospital in Landstuhl because "CID made us go.... [They] wanted us to get a test done." No one at the hospital asked her if she wanted to undergo a medical examination. In response to the question, "Did you tell [the doctors] that you didn't want to do the exam?", SR stated, "I didn't want to do the exam with a male doctor." She explained that she preferred a female doctor. Her understanding was that the examination was to determine "[i]f I had been raped or not." She also admitted that she understood everything the doctors asked her, but she denied telling them anything about the alleged sexual encounter with her stepfather. In fact, she stated that what she told her mother and the CID, "I made up that."

The military judge stated the following general observations in announcing his decision which we consider to be his essential findings of fact:[6]

> There's no doubt in my mind that Colonel Robichaux and Dr. Semancik, the reasons behind their asking of the questions was to help [SR] psychologically and medically versus trying to gather evidence. And had Colonel Robichaux and Dr. Semancik been the first persons that [SR] had told the story to, it would be a very easy ruling.
>
> But, in this particular case, by the time [SR] had gotten to Colonel Robichaux and Dr. Semancik, she had given the story to her mother and had given a detailed sworn statement to CID. So, one has to ask themselves, what if those statements to the mother and to CID were in fact false? What reason is there to believe, that just because now she's confronted by the doctors, that she's going to all of a sudden tell the truth?
>
> It's clear that it was CID that was orchestrating the investigation at this point in time. They were the ones that were the moving parties behind her going to Landstuhl. They were present. There was a rape protocol conducted. Like I say, regardless of what I may think of [SR]'s credibility, the one thing that seems to ring out from all of this is that she didn't really want to be there. She more or less submitted to the examinations. She was very uncomfortable about having anyone other than a female do the examination.

---

5. In cases such as this, where a medical examination is inextricably intertwined with a criminal investigation, and where there is no expressed indication by the "patient" that she had some expectation of receiving a medical benefit, the burden of establishing a medical diagnosis or treatment exception is a heavy one for the government. Although not required by Mil.R.Evid. 803(4), it may be a better practice for CID agents to remain outside the examination room when medical personnel are conducting the rape protocol examination. Their presence may suggest, as it did in this case, that the declarant spoke to medical personnel because she thought it was part of the investigatory process rather than for the purpose of receiving medical treatment.

6. We commend footnote 6 in *United States v. Pacheco*, 36 M.J. 530, 533 (A.F.C.M.R.1992) to

all trial practitioners. "When factual issues are involved in ruling on a motion or objection to evidence, military judges are required to state their essential findings of fact on the record.... [Rule for Courts–Martial] 905(d). *After* stating the facts, the judge should explain the legal standard applied and the analysis of the application of those standards to the facts. Finally, the military judge should announce any conclusions made and the decision. *See United States v. Reinecke*, 30 M.J. 1010 (A.F.C.M.R.1990), *rev'd on other grounds*, 31 M.J. 283 (C.M.A.1990). 'Without a proper statement of essential findings, it is very difficult for an appellate court to determine the facts relied upon, whether the appropriate legal standards were applied or misapplied, and whether the decision amounts to an abuse of discretion or legal error.' *Reinecke* at 1015." (Emphasis in original).

So, to conclude from all of that, that she probably was motivated to be honest with the doctors is a quantum leap that I'm just not prepared to take. So, I don't feel the government's been able to convince me that [SR]'s statements to Colonel Robichaux and Dr. Semancik should be allowed in as exceptions to the hearsay rule as statements made in furtherance of medical treatment.

## II. The Law

### a. Military Rule of Evidence 803(4)

■ Hearsay evidence is not admissible except as provided by the Military Rules of Evidence or by any act of Congress applicable to trials by court-martial. Mil.R.Evid. 802. In Mil.R.Evid. 803(4), the rule provides a hearsay exception for those:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

■ The premise underlying Mil.R.Evid. 803(4) is that a patient seeking help from a medical professional will be truthful because it will promote his or her well-being. *United States v. Dean,* 31 M.J. 196, 203 (C.M.A. 1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 215 (1991). The Court of Appeals for the Armed Forces [hereinafter Court of Appeals] has provided a two-pronged test for the admissibility of statements under Mil.R.Evid. 803(4): "first, the statements must be for the purpose of 'medical diagnosis or treatment'; and second, the patient must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought.'" *United States v. Edens,* 31 M.J. 267, 269 (C.M.A.1990) (quoting *United States v. Deland,* 22 M.J. 70, 75 (C.M.A. 1986), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986)). The Court of Appeals has stated that:

A key factor in determining whether the second prong is met is "the state of mind or motive of the patient in giving the infor-

mation ... and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed."

*United States v. Faciane,* 40 M.J. 399, 403 (C.M.A.1994) (citing *United States v. Clark,* 35 M.J. 98, 105 (C.M.A.1992)); *United States v. Nelson,* 25 M.J. 110, 112 (C.M.A.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988).

### b. Appeals Under Article 62, UCMJ

■ The government may appeal a legal "ruling of the military judge which ... excludes evidence that is substantial proof of a fact material in the proceeding." Article 62(a)(1), UCMJ. In deciding whether a ruling to exclude hearsay declarations was proper, we do not put ourselves in the shoes of the military judge to see if we would have made the same ruling. *United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985). Rather, our standard of review of a military judge's decision to exclude evidence is limited to whether he abused his discretion. *Reinecke,* 30 M.J. 1010, 1015 (A.F.C.M.R.1990), *rev'd on other grounds sub nom. United States v. Strozier,* 31 M.J. 283 (C.M.A.1990) (citing *United States v. Jenkins,* 27 M.J. 209, 211 (C.M.A.1988)); *United States v. Postle,* 20 M.J. 632, 640 (N.M.C.M.R.1985). In doing so, we will defer to a military judge's findings of fact unless they are unsupported by evidence of record or clearly erroneous. *Burris,* 21 M.J. at 144 (citing *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983) and *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A. 1981)).

## III. Decision

■ We have carefully reviewed the record in the court-martial proceedings and the briefs filed by the government and the accused. We have taken into account the cogent oral arguments presented by counsel. Based on the testimony given in this case, a judge could find that the victim's out-of-court statements were not made with some expectation of receiving a medical benefit for herself, but rather the statements were made for the purpose of facilitating the collection of evidence relevant to the criminal investiga-

tion of her rape allegation. Although the evidence is clearly mixed, we are not prepared to say that the military judge's findings of fact are "unsupported by evidence of record" or "clearly erroneous." Accordingly, we hold that the military judge did not abuse his discretion in ruling that SR's statements to COL Robichaux and Dr. Semancik were not admissible under Mil.R.Evid. 803(4). *United States v. Quigley,* 40 M.J. 64, 66 (C.M.A.1994).

The appeal of the United States is denied. The record will be returned to the military judge for action not inconsistent with this opinion.

Chief Judge EDWARDS and Senior Judge CAIRNS concur.